[Cite as *State v. Hawkins*, 2018-Ohio-867.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27019 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-1099 |
| | : | |
| BRIAN HAWKINS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of March, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

STEVEN H. ECKSTEIN, Atty. Reg. No. 0037253, 1208 Bramble Avenue, Washington Court House, Ohio 43160
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, Brian Hawkins, appeals from his convictions and sentences for rape and kidnapping with a sexual motivation specification. In support of his appeal, Hawkins contends that the trial court erred in overruling his motion to dismiss, which was based on a thirteen-year pre-indictment delay. Hawkins also contends that his convictions are against the manifest weight of the evidence and that cumulative errors prejudiced his right to a fair trial.

{¶ 2} In a supplemental brief, Hawkins raised several additional assignments of error, including that his convictions were based on insufficient evidence, that trial counsel provided constitutionally ineffective assistance, that the trial court violated his right to due process and a fair trial, and that prosecutorial misconduct resulted in a denial of due process. For the reasons discussed below, we find no error in the trial court proceedings. Accordingly, the assignments of error will be overruled, and Hawkins' convictions and sentences will be affirmed.

I.   Facts and Course of Proceedings

{¶ 3} In May 2015, the State filed an indictment alleging that Hawkins had raped A.J. on July 30, 2002. The trial court appointed counsel, and Hawkins then pled not guilty to the charge. In June 2015, the trial court granted Hawkins' motion for funds to hire an investigator, and authorized up to $1,000 to hire investigator, Wayne Miller. Hawkins also filed a motion to dismiss the charge, based on the State's alleged unjustifiable delay in filing the rape indictment.

{¶ 4} In July 2015, the State filed re-indictment "B," which charged Hawkins with

rape, as before, but added a second count (kidnapping, with a sexual motivation specification). Subsequently, the trial court held hearings on July 23 and August 19, 2015, concerning Hawkins' motion to dismiss. The trial court then filed a decision in October 2015, concluding that Hawkins failed to establish that the pre-indictment delay caused him real, substantial prejudice in defending the case. In addition, the court found that, assuming a contrary prejudice determination, the State could not establish that the delay occurred under justifiable circumstances.

{¶ 5} Trial was held before a jury in December 2015. After hearing the evidence, the jury found Hawkins guilty as charged. After holding a sex offender classification hearing, the trial court found that Hawkins was a sexually oriented offender. The court then merged the kidnapping and rape offenses. Upon the State's election to have Hawkins sentenced on the rape conviction, the court sentenced Hawkins to 10 years in prison.

{¶ 6} Hawkins had filed a premature appeal on the day he was convicted, prior to sentencing. That appeal was docketed as Montgomery County Case No. 26962, and was dismissed for lack of jurisdiction on February 16, 2016. Hawkins then filed a timely notice of appeal following his sentence, and that appeal is currently before us.

II. Pre-indictment Delay

{¶ 7} Hawkins' First Assignment of Error states that:

The Trial Court Erred in Overruling Mr. Hawkins' Motion to Dismiss, as the Thirteen Year Pre-Indictment Delay Caused Actual Prejudice to His Right to a Fair Trial, Thus Violating His Due Process Rights.

**{¶ 8}** Under this assignment of error, Hawkins contends that he suffered actual prejudice due to a delay of nearly 13 years between the alleged crime and the filing of the indictment. Hawkins' claim of prejudice is based on the fact that the only two persons who could potentially corroborate what happened on the night in question are now deceased.

**{¶ 9}** "An unjustifiable delay between the commission of an offense and a defendant's indictment therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution." *State v. Luck*, 15 Ohio St. 3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus. "Once a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." (Citations omitted.) *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 13.

**{¶ 10}** Decisions on "actual prejudice" involve " 'a delicate judgment based on the circumstances of each case.' " *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). To make this assessment, "courts are to consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." W*alls* at ¶ 52, citing *Luck* at 154. (Other citation omitted.) However, "speculative prejudice does not satisfy the defendant's burden." *Jones* at ¶ 20, citing *Luck* at ¶ 56. (Other citation omitted.)

**{¶ 11}** In the case before us, the trial court heard from the following witnesses at the evidentiary hearings in connection with Hawkins' motion to dismiss: Brian Hawkins;

Wayne Miller, Hawkins' private investigator; Carol Ewing, a retired detective with the Dayton Police Department ("DPD"); Lindsey Dulaney, a current detective with the DPD Special Victims' Unit ("SVU"); Gary Ware, an investigator with the Montgomery County Prosecutor's Office; and Justin Hayes, a training detective for the DPD SVU. The testimony of these individuals revealed the following factual background.

{¶ 12} In July 2002, Ewing was a detective assigned to the DPD sexual assault child endangerment unit. Ewing was assigned a case involving A.J., who had allegedly been raped in the early morning hours of July 30, 2002, while she was a runaway from a foster home. The rape occurred outdoors behind the Wesley Center, which was located on Delphos Avenue, in Dayton, Ohio.[1] At the time, A.J. was fifteen years old.

{¶ 13} After the alleged rape, A.J. ran to a nearby Burger King, which was located a few blocks from the Wesley Center, and pounded on the restaurant's door. A security guard answered and called the police, who transported A.J. to Dayton Children's Hospital, where a rape kit was done. The rape kit was then sent to the Miami Valley Regional Crime Lab ("MVRCL") for processing.

{¶ 14} Originally, based on information as to the assailant's alleged nickname of "Twin," Ewing put together two photospreads, but A.J. did not pick out either of the suspected individuals. On August 6, 2002, A.J. provided Ewing with Brian Hawkins' name, which A.J. had obtained from friends. Ewing compiled another photospread, and on August 14, 2002, A.J. identified Hawkins as the person who had committed the rape.

{¶ 15} Ewing interviewed Hawkins in his home on October 29, 2002, because he

---

[1] During testimony, witnesses referred to the Center as the Wesley Center and as the Wesleyan Center. To avoid confusion, we will use "Wesley Center."

had been recently shot and could not walk. The interview was not recorded. Ewing would have noted in her report if Hawkins were heavily sedated or under the influence during the interview. She did not make such a notation.

{¶ 16} Ewing told Hawkins the date of the alleged offense, and he said he thought he might have been in the hospital at the time. Ewing later followed up and learned that Hawkins had been in the hospital on August 11, 2002, which was about a week and a half after the alleged rape.

{¶ 17} Ewing asked Hawkins if he knew someone with A.J.'s name, and he said he did not. He stated that he did not know A.J., that he would not have sex with a minor, and that he would not have sex outside. Hawkins did not provide Ewing with the names of any witnesses or an alibi. If Hawkins had given Ewing the names of witnesses, she would have followed up.

{¶ 18} Hawkins recalled talking to a detective in October 2002. He stated that he had just gotten shot and was sedated. Although he could not recall what the detective said, he also testified that she talked about a knife, which "threw" him off. He said he thought they had the wrong person because he had never pulled a knife on anyone. The police did not show him any pictures of the victim. He also denied that he had said he would not have sex outside, as he had done that plenty of times. He claimed Ewing had lied in her report.

{¶ 19} In November 2002, Ewing was injured and her last day of work was February 2, 2004. During the interim, she had two surgeries and at some point was on restricted duty until she retired. She could not recall specific dates, other than that she had her first surgery in July 2003. In February or March 2003, Ewing received results

back from MVRCL, indicating the presence of sperm in the rape kit. Ewing then obtained a court order in October 2003 for a buccal swab from Hawkins. At that point, Ewing was on restricted duty, and another detective obtained the sample from Hawkins.

{¶ 20} DPD did not receive the results from the DNA test until March 2004, which was after Ewing retired. Hawkins' DNA was a match, and there would have been sufficient cause at that time for the police to present the case to the prosecutor's office.

{¶ 21} Ewing's notes on the case, including the photo spread, were kept in a packet, which was the official police file. There would have been a notation on the front concerning whether the case was closed or open. Ewing also kept her pending cases in a certain file cabinet. She did not know what happened to the case files after she left the DPD, and she did not recall if she specifically told someone that there were pending cases in the file cabinet.

{¶ 22} Hawkins continued to reside in the Dayton area and did not move out of state between 2002 and 2015. Nothing more was done on the case until January 2015, when Detective Dulaney received a phone call from the Miami County Prosecutor's Office, indicating that the office had received a CODIS hit or DNA match on a case that was an investigation in the city of Dayton. The prosecutor sent Dulaney a copy of the 2004 lab report. Dulaney pulled the police report and saw that A.J.'s case had never been presented to the Montgomery County Prosecutor's Office. After the case was assigned to her, Dulaney located A.J., and spoke with her. Dulaney also attempted to find Hawkins to obtain his side of the story, but could not locate him at the time.

{¶ 23} Dulaney was never able to locate Ewing's packet, which contained the photo spread and Ewing's notes. However, any notes that Ewing took and anything she

did during her investigation would have been put into a police report. Dulaney was able to obtain a copy of the police report, because that was stored electronically. The police were also able to locate the following evidence: the 2002 rape kit, which was stored at the old Montgomery County Jail; Hawkins' buccal swab, which was still at MVRCL; and A.J.'s clothing, which was still intact. In addition, DPD was able to locate the following witnesses: the MVRCL employee who had processed the rape kit; the doctor and nurse who had collected the rape kit and who were still working at Dayton Children's Hospital; the Burger King security guard, who recalled speaking to A.J.; and the DPD officer who had responded to the call from the Burger King. This officer had retired from the DPD, but recalled the incident.

{¶ 24} After being unable to find Hawkins, Detective Dulaney entered a suspect locator into the police system, which meant that if police came into contact with Hawkins, he would be told that Dulaney wished to speak with him. After the locator was in the system for a time with no success, the prosecutor went to a grand jury and obtained a warrant for Hawkins' arrest.

{¶ 25} In May 2015, Dulaney was able to interview Hawkins. At the time, he was in jail and was transported to the Safety Building for an interview. Hawkins was told that he was there for an interview in connection with a rape investigation, and after being informed of his Miranda rights, agreed to speak with the police.

{¶ 26} Dulaney told Hawkins about the allegations, and Hawkins said it never happened and that he did not know A.J. Although Dulaney showed him photos of A.J. – one photo was older, and the other was recent – Hawkins still did not recall knowing A.J. During the interview, Hawkins did not give Dulaney the names or addresses of any

witnesses. If he had given her names, she would have tried to locate the witnesses.

{¶ 27} At the pre-indictment hearing, Hawkins testified that he had reviewed the police report as part of discovery and did not deny having sex with A.J. He maintained that they agreed to have sexual relations and the activity was not due to force.

{¶ 28} According to Hawkins, he met A.J. around 3:00 a.m. on July 30, 2002, when he was leaving a "bootleg joint" on Shoop Avenue in Dayton, Ohio. The bootleg joint was an after-hours place where people came to gamble, drink, and meet women. Hawkins stated that the bootleg joint had two security guards who checked identification and patted people down. They also had a metal detector, and would not let people in who had weapons like knives. In addition, no one under 18 years of age was allowed inside. Hawkins identified three people as potential witnesses: Bobby Cartwright, who worked as a security guard, Kevin Cartwright, who used to come to the bootleg joint, and Jermaine Hunter, who was present in the yard of the bootleg joint that night.

{¶ 29} The Cartwrights were Hawkins' cousins, and could discuss security, as well as the fact that underage persons were not allowed, meaning that A.J. had lied about her age. Bobby was working that night, but would not have seen Hawkins and A.J., because he was inside. Jermaine Hunter was outside talking to A.J. when Hawkins left the bootleg joint, and was close enough to hear conversation between Hawkins and A.J. when she initially followed Hawkins away from the bootleg joint. Hunter could also testify that A.J. initiated contact with Hawkins. According to Hawkins, he had lost contact with these individuals and had not seen them for a number of years. He thought Hunter was in prison and had mental problems.

{¶ 30} Hawkins testified that when he left the bootleg joint, A.J. followed him. He

stated that at the time, he stayed at different people's houses. Consequently, he and A.J. went to different people's houses but no one was there. Hawkins described walking to a house on Delphos Avenue, then to a house on Bedford Street, back to the house on Delphos, and next to another house located at Oakridge Drive and Tyson Avenue. On the way back from the last location, A.J. propositioned Hawkins for sex the whole time.

{¶ 31} According to Hawkins, he and A.J. then had a sexual encounter behind the Wesley Center. Afterward, they went to a house on Upland Avenue, where Hawkins' friend, "Moochie," lived. Hawkins did not know Moochie's real name; everyone just called him Moochie. When Hawkins and A.J. arrived at Moochie's house, Hawkins told A.J. to stay outside, but she insisted on coming inside.

{¶ 32} Several people were at the house, including a woman named Tony Ousley, who was the mother of Hawkins' friend, "Squiggy." Hawkins and Squiggy had both grown up in the same neighborhood. According to Hawkins, he told Ousley that he and A.J. had sex and that A.J. was 18 years old. While they were there, Ousley spoke to A.J., who verified that she and Hawkins had sex. When Hawkins and A.J. left, Ousley pulled him to the side and said he needed to get away from A.J. or he was going to get in trouble. Ousley specifically stated that A.J. was lying about her age. When Hawkins found out from Ousley that A.J. was too young, he walked with A.J. for a few blocks and then handed her a couple of dollars. At that point, A.J. became angry. Hawkins believed she was mad because she thought she was going to stay with him the rest of the night.

{¶ 33} By the time of the pre-indictment hearing, Moochie's house and the house where the bootleg joint was had been torn down. Hawkins' investigator, Wayne Miller,

found the last known address of the Cartwrights, but was not able to actually locate them. He visited their last known address, but it looked vacant and vines were growing from beside the house onto the front door. Miller did locate Hunter, who was in a prison mental ward, and interviewed him. When shown a picture of A.J., Hunter said he had never seen her; he also said he could not recall ever visiting the bootleg joint on Shoop Avenue.

{¶ 34} Miller additionally discovered that Squiggy had been murdered in 2008 and that Tony Ousley passed away in 2011. At the hearing, Hawkins testified that Moochie was also dead and that he was not previously aware that Ousley had died. Hawkins said he could, however, have located both Moochie and Ousley in the past.

{¶ 35} As was noted, after the court heard the evidence, it concluded that Hawkins failed to prove actual, substantial prejudice. In particular, the court noted that its evaluation hinged on Hawkins' credibility, and that Hawkins was not credible.

{¶ 36} In contending that the trial court erred, Hawkins argues that Ohio courts have not employed a credibility analysis in pre-indictment delay cases. Hawkins further contends that the facts of this case directly compare to those in *Luck*, 15 Ohio St. 3d 150, 472 N.E.2d 1097, where the Supreme Court of Ohio held that pre-indictment delay had prejudiced the defendant. We disagree with both assertions.

{¶ 37} As a preliminary matter, Ohio appellate courts have held that decisions on motions to dismiss for pre-indictment delay should be reviewed on the following basis: legal issues are reviewed de novo, but "the court's findings of fact are afforded great deference." (Citations omitted.) *State v. Powell*, 2016-Ohio-1220, 61 N.E.3d 789, ¶ 11 (8th Dist.). *See also State v. Zimbeck*, 195 Ohio App.3d 729, 2011-Ohio-2171, 961

N.E.2d 1141, ¶ 20 (6th Dist.); *State v. Winkle*, 7th Dist. Mahoning No. 12 MA 162, 2014-Ohio-895, ¶ 23; *State v. Cochenour*, 4th Dist. Ross No. 98CA2440, 1999 WL 152127, *1 (Mar. 8,1999).

**{¶ 38}** We agree with these standards, which are consistent with standards of review for other pretrial matters like suppression motions.   In suppression situations, trial courts hear evidence on factual points and must necessarily make decisions on witness credibility.   *See, e.g., State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Brown*, 2016-Ohio-4973, 67 N.E.3d 1278, ¶ 7 (2d Dist.).   As these decisions note, trial courts "are in the best position to resolve factual questions and evaluate the credibility of witnesses."   *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).

**{¶ 39}** In *Luck*, the Supreme Court of Ohio considered whether the defendant was prejudiced by a fifteen-year delay between the time of a murder and her indictment for the murder.   *Luck*, 15 Ohio St.3d at 152, 472 N.E.2d 1097.   The defendant, Katherine Luck, was one of the suspects originally interviewed around the time of the crime. However, after an initial investigation, the police could not gather any new evidence and took no official action for about fifteen years.   *Id.* at 151.   At that point, for reasons that were not clear in the record, an indictment was obtained against Luck, and she was arrested.   *Id.*

**{¶ 40}** While under arrest, Luck made a confession at the police station, indicating that she had been physically attacked by the decedent, who was then killed in the fight that ensued.   *Id.* at 157.   According to Luck's confession, another individual, who was her acquaintance (and who had also been an original suspect) was present at the time of

the alleged murder. *Id.* She told the police that this person, who was the only one who could help her, was dead. *Id.*

{¶ 41} After concluding that the confession had been illegally obtained, the court found that defendant was "obviously prejudiced by not being able to seek verification of her story from [the deceased witness] and thereby establish mitigating factors or a defense to the charge against her." *Id.* at 158. Finding both actual prejudice and an unjustifiable delay by the State, the court affirmed the dismissal of the murder charge. *Id.* at 159.

{¶ 42} Unlike the defendant in *Luck*, Hawkins never asserted, either when he was originally interviewed in 2002, or when he was interviewed in 2015, that he had consensual sex with A.J. and that witnesses existed who could verify his story. Instead, he denied that he had been involved in any such incident. Consequently, *Luck* is not directly comparable to the case before us.

{¶ 43} In *State v. Dixon*, 2015-Ohio-3144, 40 N.E.3d 601 (8th Dist.), the State waited almost 20 years to indict a defendant for rape. *Id.* at ¶ 2. After the trial court dismissed the charge due to pre-indictment delay, the Eighth District Court of Appeals affirmed. Notably, in that case, two parole revocation hearings were held in 1993, shortly after the victim told the police that the defendant had raped her.[2] At the parole revocation hearings, the defendant admitted having sexual intercourse with the complainant, but claimed it was consensual. *Id.* at ¶ 6. The defendant was sent back to prison for the

---

[2] After reporting the alleged rape to the police and having a rape kit done, the victim signed a "no prosecution" form and the defendant was released from jail. However, parole violation hearings were still held. *State v. Dixon*, 2015-Ohio-3144, 40 N.E.3d 601, ¶ 6 (8th Dist.).

parole violation, but the State did not initiate any prosecution on the rape charge for almost 20 years, after the police "received a CODIS [Combined DNA Index System] hit confirmation from the Federal Bureau of Criminal Investigation that they had made a preliminary association between a submitted rape kit and the Defendant." *Id.*

{¶ 44} Two witnesses who had testified at the parole revocation hearings were unavailable, including the defendant's former employer, who was deceased. *Id.* at ¶ 9. This witness, Norman Diamond, had testified at the revocation hearings that "he spoke with the alleged victim after the incident and the victim told Diamond that 'she had feelings for [Dixon]' and 'if she could not have [Dixon], no one would.' Diamond further testified that the alleged victim told him that the sexual encounter was 'mutual with no force.' " *Id.*

{¶ 45} In concluding that the defendant had established actual prejudice, the court commented that the case against the defendant hinged on the victim's credibility. *Id.* at ¶ 30. The court further observed that the testimony of the deceased witness directly supported the defendant's assertion that the sex was consensual, and also undermined the victim's testimony. *Id.*

{¶ 46} Again, these facts are far different than those involved in the case before us. Hawkins never asserted that the sex was consensual or that witnesses existed.

{¶ 47} Hawkins also relies on *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, in which the court stated that a defendant's "inability to articulate specifically what [a witness's] testimony would have been does not render his claim of prejudice fatally speculative," as the court has "held that a defendant may establish actual prejudice where he or she is unable to seek verification of his or her story from a deceased witness." *Id.* at ¶ 28, citing *Luck*, 15 Ohio St.3d at 157, 472 N.E.2d 1097. However, by

making these comments, the court was not advancing a novel proposition of law; it was discussing its prior decision in *Luck*. Moreover, the issue in the case before us is not Hawkins' inability to articulate the content of a deceased witness's testimony; the relevant matter is that the trial court did not find Hawkins credible. As was noted, the trial court was in the best position to assess credibility, and we defer to the court's factual findings.

{¶ 48} As a final matter, Hawkins contends that the State's pre-indictment delay was not justifiable, as the police simply allowed the case to "slip through the cracks." Because Hawkins failed to meet his initial burden of proving actual prejudice, we need not consider this issue. *See, e.g.*, *Jones* at ¶ 13, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998), and *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 99.

{¶ 49} Accordingly, the trial court did not err when it concluded that Hawkins failed to establish actual prejudice. The First Assignment of Error, therefore, is overruled.

III. Manifest Weight and Sufficiency of the Evidence

{¶ 50} Hawkins has raised issues pertaining to manifest weight and sufficiency of the evidence. Because these issues are related, we will consider them together. Hawkins' Second Assignment of Error states that:

The Jury Erred in Finding Mr. Hawkins Guilty of Rape and Kidnap as

the Convictions Are Against the Manifest Weight of the Evidence.

{¶ 51} Hawkins' Fourth (and First Supplemental) Assignment of Error states as follows:

Hawkins' Convictions Were Based on Insufficient Evidence.[3]

**{¶ 52}** Under the manifest weight assignment of error, Hawkins argues that the physical evidence supports his version of events, and that A.J. made multiple inconsistent statements. Concerning sufficiency, Hawkins contends that the only evidence of a forcible encounter came from A.J., who had a revenge motive to lie, as she was bitter because she did not succeed in her efforts to find a place to stay and to obtain money.

**{¶ 53}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10. In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

> An appellate court's function when reviewing the sufficiency of the evidence
>
> to support a criminal conviction is to examine the evidence admitted at trial
>
> to determine whether such evidence, if believed, would convince the
>
> average mind of the defendant's guilt beyond a reasonable doubt. The
>
> relevant inquiry is whether, after viewing the evidence in a light most
>
> favorable to the prosecution, any rational trier of fact could have found the
>
> essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

**{¶ 54}** In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence

---

[3] Hawkins' initial brief contained three assignments of error. He filed a supplemental brief in August 2017, raising four additional assignments of error.

is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 55} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.) As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 56} Furthermore, since a factfinder "has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial

deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 57} In contrast, "the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." *Id.* "Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, no matter how persuasive the evidence may be." *State v. Brooks*, 2d Dist. Montgomery No. 21531, 2007-Ohio-1029, ¶ 28, citing *Lawson* at *4.

{¶ 58} After reviewing the record, we conclude that the judgment of the trial court is not against the manifest weight of the evidence, and, therefore, is also supported by sufficient evidence.

{¶ 59} Hawkins was indicted on one count of rape in violation of R.C. 2907.02(A)(2). This statute provides, in pertinent part, that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" includes, among other things, "vaginal intercourse between a male and female." R.C. 2907.01(A).

{¶ 60} Hawkins was also charged with kidnapping in violation of R.C. 2905.01(A)(4). This statute provides, in pertinent part, that:

No person, by force, threat, or deception, or, in the case of a victim

under the age of thirteen or mentally incompetent, by any means, shall

remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will * * *.

{¶ 61} As was noted, the victim, A.J., was 15 years old at the time of the alleged offenses, and the trial did not occur until more than 13 years later. A.J. did not recall every detail, but did specifically recall encountering Hawkins in the early morning hours of July 30, 2002, near Shoop Avenue, and walking with him for a period of time, during which he told her that he had a place for her to stay and that he wanted to feed her and treat her like his daughter. However, when they were on a sidewalk that ran behind the Wesley Center, Hawkins became physical, threw A.J. on the ground, and raped her, by inserting his penis into her vagina. He also held a knife to her neck and restrained her.

{¶ 62} After this occurred, A.J. ran to a nearby Burger King for help. Her testimony in this regard was corroborated by the security guard, who stated that a distraught female came to the restaurant around 4:00 a.m. on July 30, 2002, and asked for help. According to the guard, the woman was crying and asked him to call the police, which he did.

{¶ 63} The responding officer, Jeffrey Huber, testified that when he arrived at Burger King, A.J. was crying and visibly shaking, and her hair was out of order. She reported that she had come in contact with a man on Shoop Avenue, and had walked with him for a while, during which time he said he would take care of her and get her food. However, the man subsequently grabbed her while they were behind the Wesley Center

and told her to pull her pants down. When she resisted, he pulled out a knife and threatened her. He then raped her. Huber took A.J. back to the Wesley Center, and she pointed out the area where the rape had occurred. Huber noticed grass in A.J.'s hair and on her clothing, and he could tell that someone had been on the ground in the area that she pointed out. He then took A.J. to Dayton Children's Hospital.

{¶ 64} The nurse who examined A.J. at the hospital testified about a history that A.J. had given her concerning the incident. This history was similar to the facts noted above. The nurse further stated that A.J. reported pain in her pelvic bone. In addition, the doctor who conducted A.J.'s physical examination observed swelling in the vaginal area to the extent that he was unable to insert a small speculum in that area. The doctor testified that he found evidence of sexual activity consistent with penile vaginal rape.

{¶ 65} Detective Ewing, who first worked on the case, met with A.J. the day after the incident. Ewing also recounted various details of A.J.'s story that were consistent with A.J.'s statements to the other witnesses and with A.J.'s trial testimony. Ewing additionally testified about details of her interview with Hawkins in October 2002. At that time, Hawkins stated that he did not know A.J., would never have sex with a minor, and would not have sex outside. Transcript of Proceedings (Jury Trial), Vol. I, p. 237.

{¶ 66} In contrast to this evidence, Hawkins testified that as he had during the pre-indictment hearing, which was that he met A.J. outside the bootleg joint and that they walked to various locations in the area. Hawkins described A.J. basically as following him throughout this time, persisting when he walked away from her, and eventually initiating and consenting to have sexual intercourse. His implication was that A.J. did so in order to obtain money and shelter. He also believed that A.J. accused him of rape

because she was angry when he left her after they had sex.

{¶ 67} There were a few inconsistencies in A.J.'s testimony, such as whether Hawkins held the knife to the left or to the right side of her neck, or whether the knife was closed or open. This would not be surprising, given A.J.'s age at the time of the incident, and the lapse of time between the incident and her testimony. However, substantial evidence supported her account.

{¶ 68} There were inconsistencies in Hawkins' account as well. For example, Hawkins testified at trial that he had introduced himself by name to A.J. outside the bootleg joint, and that she had given him her name as well. He also indicated that he later found out she was underage and that they had consensual sex outside the Wesley Center. This testimony was inconsistent with statements Hawkins made to police in 2002, when he denied knowing A.J., and said he would not have sex either with a minor or outside. It is also inconsistent with his statement to police in 2015, when he denied ever having seen A.J., despite being shown pictures of her taken in 2004, a few years after the incident.

{¶ 69} "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. * * * The trier of fact is free to believe or disbelieve all or any of the testimony." (Citations omitted.) *State v. Crosky*, 10th Dist. Franklin No. 06AP-655, 2008-Ohio-145, ¶ 78. The trier of facts was in the best position to evaluate witness credibility and to decide the weight to give the testimony. *Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, at *4. Clearly, the jury believed A.J. and the ample evidence that supported her testimony.

{¶ 70} Because the judgment was not against the manifest weight of the evidence,

it was also supported by sufficient evidence.   Consequently, the Second and Fourth Assignments of Error are without merit and are overruled.

IV.   Ineffective Assistance of Counsel

**{¶ 71}** At this point, we will consider the assignments of error out of order, because the Third Assignment of Error is based on cumulative error, which should be considered after the other assignments of error have been resolved.

**{¶ 72}** Hawkins' Fifth (and Second Supplemental) Assignment of Error states that:

Hawkins' Counsel Provided Constitutionally Ineffective Assistance

Under the Fifth, Sixth, and Fourteenth Amendments of the United States

Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**{¶ 73}** Under this assignment of error, Hawkins' first contention is that trial counsel was ineffective because he failed to call A.J. as a witness at the hearing on pre-indictment delay.   According to Hawkins, there is a reasonable probability that the court would have granted his motion to dismiss the indictment if A.J. had been called to testify.   As support for this assertion, Hawkins recounts A.J.'s trial testimony, in which she detailed walking around with Hawkins, being forcibly thrown to the ground, and being raped at knifepoint. Hawkins does not indicate how this testimony would have assisted his motion for pre-indictment delay, other than observing that A.J. remembered some things that happened to her, but did not remember everything.

**{¶ 74}** "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice."   *State v. Sosnoskie*, 2d Dist. Montgomery No. 22713, 2009-Ohio-2327, ¶ 16, citing *Strickland v.*

*Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Id.*

{¶ 75} Hawkins has failed to articulate how having A.J. testify at the motion hearing would have assisted his claim of actual prejudice in the pre-indictment delay, and we see no potential basis for finding trial counsel deficient in this regard. In fact, to the extent that A.J. failed to recall any events, it would have assisted Hawkins at trial in defending against her claims, i.e., he could have challenged inconsistencies or gaps in her testimony.

{¶ 76} Hawkins' second claim of ineffective assistance is based on the fact that trial counsel requested a jury view. According to Hawkins, many structures were torn down and he was prejudiced. He does not suggest how he was prejudiced, and we see no potential prejudice. Given Hawkins' detailed (and sometimes confusing) description of routes he and A.J. took while they walked around, a view of the area would have been helpful to the jury. Furthermore, the State also requested a jury view, and the trial court would have had discretion to grant a jury view. *See, e.g.*, *State v. Zuern*, 32 Ohio St.3d 56, 58, 512 N.E.2d 585 (1987).

{¶ 77} Hawkins' third contention is that trial counsel was ineffective by failing to argue for admission of a social worker's commentary from the rape kit, which could have been used to impeach A.J.'s testimony. This evidence was contained in State's Ex. 11R, and included "references to sexual activity of A.J. and her promiscuity." Transcript of Proceedings (Jury Trial), Vol. II, p. 332. According to the record, this matter had been

discussed prior to the start of trial, and the court had informed defense counsel then that the testimony was inadmissible based on the rape shield law. *Id.* at pp. 331-32. During the discussion of this point, defense counsel stated that he did not pursue the issue based on the court's ruling. *Id.* at 332. Nonetheless, the matter, in fact, was discussed in detail, and the trial court specifically stated that the issue had been preserved for appellate review. *Id.* at 332-33.

{¶ 78} The earlier discussion of this issue occurred in the context of the renewal of Hawkins' motion to dismiss for pre-indictment delay. Transcript of Trial Proceedings (Jury Trial), Vol. I, pp. 9-12. At that point, Hawkins' counsel objected because he had not been able to obtain records from Grandview Hospital concerning an assault, perhaps sexual, of A.J. that had allegedly occurred a few weeks before the July 30, 2002 incident. Grandview Hospital had destroyed these records after 10 years and they could not be obtained. Defense counsel had learned of these records based on the social worker's note in the rape kit; the form also referred to treatment for sexually-transmitted disease, but the context was not clear. *Id.* at p. 11.

{¶ 79} The trial court stated that this did not affect its prior ruling on pre-indictment delay for two reasons: (1) the defense had the information in the rape kit, which was the central issue at trial; and (2) the records would not have had any impact because there was no indication that they would have led to any admissible evidence. *Id.* at p. 11-12.

{¶ 80} R.C. 2907.02(D) provides that:

Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it

involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

**{¶ 81}** "Generally, the rape shield statute excludes evidence of the victim's prior sexual conduct as a means to attack credibility." *State v. Core*, 2d Dist. Montgomery No. 9976, 1987 WL 12968, *4 (June 17, 1987), citing *State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265 (1983). In order to avoid violation of the Confrontation Clause, the Supreme Court of Ohio has used a balancing test to decide whether the evidence may be admitted in certain limited situations. "The key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." *State v. Gardner*, 59 Ohio St.2d 14, 18, 391 N.E.2d 337 (1979). In *Gardner*, the court rejected the "assumption that prior unchastity with other individuals indicates a likelihood of consent to the act in question with the defendant." *Id*.

**{¶ 82}** " 'Cases decided since *Gardner* * * * have established that in order for the contested evidence to be admissible, it must be submitted for a more important purpose than mere impeachment of a witness's credibility.' " *State v. Hicks*, 2d Dist. Montgomery No. 17730, 2000 WL 646505, *4 (May 19, 2000), quoting *In Re Michael*, 119 Ohio App.3d 112, 119, 694 N.E.2d 538 (2d Dist.1997). *Accord State v. Hennis*, 2d Dist. Clark No. 2003-CA-21, 2005-Ohio-51, ¶ 52 ("impeaching a witness's credibility is an insufficient reason for admitting evidence that violates the Rape Shield Law").

**{¶ 83}** Hawkins does not assert any specific basis for admitting the evidence in

question, and it is apparent that the purpose would have been to challenge A.J.'s credibility, which is forbidden under R.C. 2907.02(D) and cases interpreting the statute. Accordingly, defense counsel did not act ineffectively in allegedly failing to argue for admission of the testimony. Moreover, as the State notes, defense counsel did raise this point with the trial court.

{¶ 84} The fourth issue that Hawkins raises is defense counsel's alleged ineffectiveness in failing to provide the trial court with evidence during the pre-indictment hearing that would have corroborated phone calls that Tony Ousley made to the Dayton Police Department. Notably, nothing to this effect was raised during the pre-indictment hearing, even though Hawkins testified at length on two different occasions – initially on July 23, 2015, and then on rebuttal on August 19, 2015, when Hawkins indicated that he had "remembered some facts that he did not testify to at the previous hearing." Transcript of Proceedings (Evidentiary Hearing), p. 126.

{¶ 85} At the subsequent jury trial, Hawkins discussed some events that allegedly occurred after the DNA swab was taken in late December 2003. According to Hawkins, he told his friend, "Moochie," about the fact that he had been swabbed. Moochie then contacted Ousley, who called the Dayton police. Apparently, the purpose of this call was to inform someone at the police department that Hawkins had not raped anyone.

{¶ 86} At trial, Hawkins did not identify any person who was called, the date the call took place, the number that was called, or Ousley's phone number. Hawkins testified that Ousley talked to detectives for 15-20 minutes. Hawkins then talked to someone and handed the phone back to Ousley. According to Hawkins, when he talked to this detective on the phone, he was told the detective would "take care" of it. As a result,

Hawkins thought the issue had been resolved.

{¶ 87} Hawkins now argues that trial counsel was ineffective because he failed to subpoena telephone call records from the DPD for use at the pre-indictment delay hearing.

{¶ 88} As the State notes, these assertions are wholly speculative. There is no evidence in the record concerning these alleged facts, other than Hawkins' unsubstantiated and vague statements about a phone call at some unidentified date to unidentified persons. The record does not even contain any indication that the police department recorded calls or numbers for calls, or that telephone records were maintained or preserved. Furthermore, as the State points out, the record lacks any indication that even if such records were maintained, they would indicate who was on a particular telephone call. Accordingly, we cannot conclude under this set of facts that trial counsel was ineffective when he failed to subpoena such records for the pre-indictment delay hearing.

{¶ 89} Hawkins' final point pertains to trial counsel's failure to provide the State with notes of his investigator's conversation with A.J. According to Hawkins, this failure prevented trial counsel from being able to properly cross-examine and impeach A.J. about comments she made to the investigator. The comment that Hawkins mentioned concerns A.J.'s statement that the knife was "closed" rather than open at the time of the assault.

{¶ 90} Hawkins' complaint in this context is unclear. At some point prior to trial, Hawkins' investigator, Wayne Miller, spoke with A.J. over the telephone. Subsequently, at trial, A.J. testified that Hawkins threatened her with a pocket or kitchen knife prior to

the rape, by holding it against her neck. She stated that it was more like a kitchen knife and had a pointed end. During cross-examination, A.J. said she did not recall talking to Miller about a week before trial, and denied telling him that the knife was like a folding knife and was closed, rather than open. Transcript of Proceedings (Jury Trial), Vol. I, pp. 89-91.

{¶ 91} At that point, the State objected because it had not received a copy of Miller's report. Defense counsel indicated that Miller had not made a report; instead, Miller simply told counsel about the conversation. *Id.* at p. 92. The following exchange then occurred:

MS. DODD: Well, you're – under the discovery rules as they exist now –

MR. CASS: That I have to make a report?

MS. DODD: – we're entitled to the information.

THE COURT: That's true. As I, I don't have Rule 16 in front of me but I think that is the gist of it. If it's – but it is quite surprising that she doesn't even remember the phone conversation.

MS. DODD: She remembers the phone [conversation]. She's told us about the phone conversation. I don't know I should –

THE COURT: Well, then you –

MS. DODD: And I, we'll have to talk to her about that. But she does remember the phone conversation.

MR. CASS: I mean I can have him prepare a report for you.

MS. DODD: Well, it isn't going to do me any good now.

THE COURT: How much further are you going to go with what she told Miller?

MR. CASS: I don't know if I have anything else.

THE COURT: All right. If that's the extent of it, it's done. What's done is done and you [the State] can talk about it with her on redirect. Okay?

And – But if Miller's going to testify about it (indiscernible) evidentiary issues regarding that. But if he is, you need a report before he testifies.

MR. CASS: Okay.

Transcript of Trial Proceedings, Vol. I, pp. 92-93.

{¶ 92} At this time, the only party potentially prejudiced was the State, as it did not have a report from the defense investigator. Subsequently, during redirect examination, the State did question A.J. about the phone call. A.J. then said that she recalled receiving a phone call from an investigator in the last few weeks. She first stated that the individual identified himself as an investigator working for the defendant and then said she thought it was a prosecutor because that is what he said on the phone. *Id.* at pp. 100-102.

{¶ 93} Miller was then called as a witness during the defense case. Miller explained that he had tried to contact A.J., and that she had actually called him at his office. According to Miller, A.J. brought up the knife issue during their conversation. Her statement was that the knife had a brown handle and was closed. Transcript of Proceedings, Vol. II, p. 343-344.

{¶ 94} During Miller's cross-examination, the prosecutor stated that "And with

respect to [A.J.'s] conversation with you – now that we've moved courtrooms, I have to find your report. Let me find my copy of your report. I moved it when we moved courtrooms." *Id.* at p. 346. The State then cross-examined Miller about his conversation with A.J. and his report. *Id.* at 347-349. In addition, the defense questioned Miller about the conversation with A.J. on redirect examination. *Id.* at pp. 350-351.

{¶ 95} In light of these circumstances, Hawkins' claim of ineffective assistance of counsel is without merit. Defense counsel was able to impeach A.J. concerning her inconsistent statements about the knife, and was also able to present testimony from the defense investigator during Hawkins' defense case, because Hawkins did produce a report for the State. The record does not indicate that any more could or should have been done.

{¶ 96} Based on the preceding discussion, we find no evidence of ineffective assistance of counsel. Accordingly, the Fifth (and Second Supplemental) Assignment of Error is overruled.

V. Alleged Denial of Due Process

{¶ 97} Hawkins' Sixth (and Third Supplemental) Assignment of Error states that:

The Trial Court Denied Hawkins His Right to Due Process and a Fair

Trial in Violation of the Fifth and Fourteenth Amendments to the United

States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 98} Under this assignment of error, Hawkins first contends that the trial court abused its discretion in deciding to allow a jury view because many of the structures in

the area had been torn down. However, "a view of a crime scene is not considered evidence, nor is it a crucial step in the criminal proceedings." *State v. Hopfer*, 112 Ohio App.3d 521, 542, 679 N.E.2d 321, (2d Dist.1996), citing *State v. Richey*, 64 Ohio St.3d 353, 367, 595 N.E.2d 915 (1992), *overruled on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 402-404, 686 N.E.2d 1112 (1997). (Other citation omitted.) In addition, trial courts have "broad discretion" in deciding whether to allow juries to view a crime scene. *Id.*, citing *Richey* and *Zuern*, 32 Ohio St.3d at 58, 512 N.E.2d 585.

{¶ 99} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). However, most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 100} We have already discussed the jury view, and for the reasons previously expressed, find no abuse of discretion. Both sides asked for a jury view, and even if they had not, a jury view would have been helpful in light of Hawkins' lengthy testimony about various routes he and A.J. traveled. Consequently, this issue is without merit.

{¶ 101} Hawkins' second contention is that the trial court denied him the opportunity to defend himself by cutting off his testimony at the hearing on the motion to dismiss.

{¶ 102} "Due process requires only 'that criminal defendants be afforded a meaningful opportunity to present a complete defense.' " *State v. Hale*, 119 Ohio St.3d

118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 46, quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

{¶ 103} Trial courts have sound discretion in deciding whether to reopen cases for further testimony, and we do not disturb the court's decision absent an abuse of discretion. *City of Columbus v. Grant*, 1 Ohio App.3d 96, 97, 439 N.E.2d 907 (10th Dist.1981). *Accord State v. Griffin*, 2d Dist. Montgomery No. 20681, 2005-Ohio-3698, ¶ 49. Our review of the pre-indictment delay hearing reveals neither a denial of due process nor an abuse of discretion.

{¶ 104} Hawkins was represented by counsel at the hearing and was able to testify at length on two separate occasions – once during his own case, and again, on rebuttal. After Hawkins finished his rebuttal testimony, the State had no questions, and the court told Hawkins to step down from the witness stand. Transcript of Proceedings (Evidentiary Hearing), p. 134. Hawkins' counsel then told the court that he had nothing else to present. *Id.* Following this statement, Hawkins interrupted the court to ask if he could say something, and the court said "no." *Id.* The court then allowed the parties to file written arguments. *Id.* at 134-135.

{¶ 105} Hawkins had ample opportunity to testify and had finished his testimony. Furthermore, Hawkins' counsel did not ask to reopen the testimony; instead, Hawkins interrupted the court. The trial court did not act unreasonably, arbitrarily, or unconscionably in refusing Hawkins' request.

{¶ 106} Hawkins' third contention raises the same issue, only in connection with the jury trial. As support, Hawkins cites the Transcript of Proceedings (Jury Trial), Vol. II, pp. 392 and 400. On page 392, the court sustained an objection when Hawkins

testified about what a deceased third party (Ousley) told him. On page 400, the court sustained another objection when Hawkins testified about what another deceased third party (Moochie) told him.

{¶ 107} "The admission of evidence is generally within the sound discretion of the trial court, and a reviewing court may reverse only upon the showing of an abuse of that discretion." (Citations omitted.) *Peters v. Ohio State Lottery Comm.*, 63 Ohio St.3d 296, 299, 587 N.E.2d 290 (1992).

{¶ 108} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Hearsay is inadmissible, with certain exceptions. Evid.R. 802. Where a declarant is unavailable for a hearing or trial because he or she is deceased, Evid.R. 804(B) allows testimony to be admitted in limited situations, such as where the decedent made a statement under belief of impending death. Evid.R. 804(B)(2). There are a few other exceptions, but none of the exceptions apply. As a result, the trial court did not abuse its discretion in refusing to admit Hawkins' testimony about what Ousley or Moochie told him, and there was no denial of due process.

{¶ 109} Based on the preceding discussion, the Sixth (and Third Supplemental) Assignment of Error is overruled.


VI. Prosecutorial Misconduct

{¶ 110} Hawkins' Seventh (and Fourth Supplemental) Assignment of Error is as follows:

Prosecutor's Misconduct So Infected These Proceedings With

Unfairness as to Make the Resulting Conviction a Denial of Due Process.

{¶ 111} Under this assignment of error, Hawkins presents three arguments. The first is that when the State filed the re-indictment, it included language in the kidnapping charge to the effect that the act may have involved a victim who was under the age of thirteen or was incompetent. Hawkins objects to the inclusion of this language because the State knew that A.J. was over the age of 13 and was not incompetent. Hawkins also claims that the kidnapping charge was added as a retaliatory act because he had filed a motion to dismiss the indictment.

{¶ 112} However, Hawkins failed to object to the re-indictment in the trial court, and we, therefore, review only for plain error. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 138. Plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Our review reveals no error, let alone plain error.

{¶ 113} It is true that punishing " 'a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort * * *.' " *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 8, quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). (Other citation omitted.) However, we have stressed that " '[t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the

proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized.' " *State v. Perkins*, 191 Ohio App.3d 263, 2010-Ohio-5161, 945 N.E.2d 1083, ¶ 33 (2d Dist.), quoting *United States v. Goodwin*, 457 U.S. 368, 381–382, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).

{¶ 114} In *Perkins*, we contrasted pretrial situations from those where changes in charging decisions are made after trial begins or by the time convictions have been obtained. *Perkins* at ¶ 33, citing *Goodwin*. We observed that decisions made at the latter times are more likely to be improperly motivated because, by those times, the State would have obtained all information about an accused, and would have decided the extent to which he or she should be prosecuted. *Id.*

{¶ 115} We further noted that prior to trial, defendants are expected to assert procedural rights that impose burdens on the State. *Perkins* at ¶ 34, citing *Goodwin*. Such pretrial motions routinely include matters like motions to suppress, challenges to " 'form and sufficiency' " of indictments, and pleading affirmative defenses. *Id.* We stressed that prosecutors " 'should remain free before trial to exercise the broad discretion entrusted to [them] to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct.' " *Id.* at ¶ 35, quoting *Goodwin* at 382.

{¶ 116} As a final matter, we observed that the grand jury system protects against prosecutorial vindictiveness, since its responsibilities " 'include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions.' " *Perkins* at ¶ 40, quoting *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). *See also State v. Kothe*, 8th Dist. Cuyahoga No. 49330, 1985 WL 4750, *6 (Dec. 26, 1985)

(rejecting defendant's contention that prosecution indicted him in retaliation for objecting to the sufficiency of two prior indictments for the offense because grand juries are independent bodies).

{¶ 117} No evidence of vindictiveness is apparent in the record. Evidentiary support existed for a kidnapping charge, and the grand jury was the body that decided if the facts warranted the additional charge.

{¶ 118} Concerning the language in the indictment, Hawkins again waived error other than plain error by failing to object. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, paragraph three of the syllabus. Again, however, there was no error.

{¶ 119} Crim.R. 7(B) provides that a statement in the indictment "may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged." An indictment's purpose is to give an accused party notice of " 'that which he may expect to meet and be required to answer; so that the court and jury may know what they are to try, and the court may determine without unreasonable difficulty what evidence is admissible.' " *Horner* at ¶ 10, quoting *Horton v. State*, 85 Ohio St. 13, 19, 96 N.E. 797 (1911).

{¶ 120} The language used in re-indictment B conformed to the kidnapping statute, which states that "[n]o person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly * * * [r]estrain another of the other person's liberty." R.C. 2905.01(B)(2). Accordingly, there was no error, let alone plain error constituting a miscarriage of justice.

{¶ 121} Hawkins' second argument is that the State denied him access to materials that would have assisted him at trial, and that the result would have been different if disclosure had been made. These materials include the Grandview Hospital records regarding an assault of A.J., and allegedly, A.J.'s mental health records.

{¶ 122} "The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph four of the syllabus, following *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 123} "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense." *Id.* at paragraph five of the syllabus, following *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). " 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 27, quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

{¶ 124} "The rule in *Brady* only applies to evidence unknown to the defendant at

the time of the trial." *State v. Royster*, 2d Dist. Montgomery No. 26378, 2015-Ohio-625, ¶ 17, citing *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991), *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 28, fn.2, and *State v. Buhrman*, 2d Dist. Greene No. 96 CA 145, 1997 WL 566154, *7 (Sept. 12, 1997). *See also State v. Wickline*, 50 Ohio St.3d 114, 116, 552 N.E.2d 913 (1990), citing *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 68 ("a *Brady* violation involves the discovery, *after* trial, of information that was known to the prosecution but unknown to the defense").

**{¶ 125}** In the case before us, *Brady* would not apply to the Grandview Hospital records, including records pertaining to A.J.'s mental health, as Hawkins was aware of these records at the time of trial. *See* Transcript of Proceedings (July Trial), Vol. I, pp. 9-12, and Hawkins' motion to produce medical records filed on October 15, 2015 (asking the court to order disclosure of Grandview Hospital records, which referenced an assault two weeks prior to the alleged rape, as well as A.J.'s emotional problems).

**{¶ 126}** Furthermore, the State did not withhold these records. Instead, Grandview Hospital no longer had any records, as the records had been destroyed, pursuant to the hospital's policy of destroying records after ten years. *Id.* at p. 9. Accordingly, *Brady* simply does not apply, and even if it did, there is no indication that the State withheld any evidence.

**{¶ 127}** Hawkins' final argument under this assignment of error is that the State committed misconduct when it said the DNA swab was taken at Hawkins' home when the State knew it had been taken when Hawkins was in jail.

**{¶ 128}** "The test for prosecutorial misconduct is whether the remarks were

improper and, if so, whether they prejudicially affected the accused's substantial rights. * * * The touchstone of our analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " (Citation omitted.) *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 226, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶ 129}** Our review of the record indicates that the State did not commit misconduct. At trial, Hawkins testified during direct examination that a DNA swab had been taken from him in December 2003 when he (Hawkins) was in jail. During cross-examination, the State showed Hawkins State's Ex. 9, which indicated that the DNA sample had been recovered at a private address, not at the jail. Transcript of Proceedings (Jury Trial), Vol. II, p. 481.

**{¶ 130}** According to Hawkins, his post-conviction petition indicates that he, in fact, was in jail when the swab was taken. In response, the State notes that we cannot consider matters that were not in the trial record.

**{¶ 131}** We agree with the State. The Supreme Court of Ohio held many years ago that "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978).

**{¶ 132}** In addition, the State contends that it was allowed to rely at trial on the information it had at the time, as depicted on Ex. 9. Again, we agree. Assuming for purposes of argument that Ex. 9 was incorrect in this regard, there is no indication that the State was aware of that. *See, e.g., State v. Simpson*, 2d Dist. Montgomery No. 19797, 2004-Ohio-669, ¶ 54 (refusing to find misconduct based on prosecutor's

inadvertent and isolated misstatement); *State v. Smith*, 2d Dist. Greene No. 2005CA70, 2006-Ohio-2132, ¶ 25 (prosecutor's reference to photo-spread was improper but was isolated and did not rise to level of misconduct). Accordingly, we find no merit in Hawkins' argument about prosecutorial misconduct.

**{¶ 133}** Based on the preceding discussion, the Seventh (and Fourth Supplemental) Assignment of Error is overruled.

## VII. Cumulative Effect of Errors

**{¶ 134}** The final assignment of error that we will consider is Hawkins' Third Assignment of Error, which states that:

> The Cumulative Effect of the Errors Deprived Mr. Hawkins of a Fair Trial and Therefore, Warrant a Reversal Under the Cumulative Error Doctrine.

**{¶ 135}** Under this assignment of error, Hawkins contends that the cumulative effect of errors below deprived him of a fair trial. Under the cumulative error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. However, before we can find cumulative error, "we first must find that multiple errors were committed at trial." (Citation omitted). *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 40. Since we have found no error, there can be no cumulative error. *Id.*

**{¶ 136}** Accordingly, the Third Assignment of Error is overruled.

## VIII.   Motion for Judicial Notice

**{¶ 137}** As a final matter, we note that on December 8, 2017, Hawkins filled a pro se document entitled "Judicial Notice."   Hawkins indicates he is giving "judicial notice" of various facts in the documents that are attached.   These documents, however, consist of numerous emails Hawkins wrote to his appellate counsel concerning his brief.   The matters in question are not in the trial court record and are not properly considered on appeal.   As we noted, we cannot add matters to the record and decide appeals based on the new material.   *Ishmail*, 54 Ohio St.2d at 402, 377 N.E.2d 500.   The motion for "judicial notice" is, therefore, overruled.

## IX.   Conclusion

**{¶ 138}** All of Hawkins' assignments of error and supplemental assignments of error having been overruled, the judgment of the trial court is affirmed.   Hawkins' pro se "Judicial Notice" motion is also overruled.

. . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Heather N. Jans

Steven H. Eckstein
Hon. Erik Blaine