**[Cite as *State v. Kocevar*, 2023-Ohio-1513.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29483 |
| | : | |
| v. | : | Trial Court Case No. 2020 CR 01833 |
| | : | |
| PEYTON J. KOCEVAR | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 5, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

CATHERINE H. BREAULT and JON PAUL RION, Attorneys for Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant Peyton Kocevar appeals from his convictions on three counts of rape and one count of gross sexual imposition. The convictions involved sexual offenses against three victims: K.K., A.H., and J.T., who were among six victims Kocevar allegedly raped. Following two jury trials and these convictions, the court

sentenced Kocevar to 11 years on each rape charge and one year on the gross sexual imposition charge, with the terms to be served concurrently for a total prison term of 11 years.

{¶ 2} According to Kocevar, the trial court erred in the following ways: (1) by refusing to sever the multiple sexually-oriented charges for trial; (2) by denying Kocevar's motion to dismiss the rape charge involving K.K. due to the State's delay in initiating prosecution; and (3) by sentencing Kocevar as an adult to mandatory terms of incarceration in violation of his right to equal protection and prohibitions against cruel and unusual punishment and ex post facto laws. In addition, Kocevar contends his convictions should be reversed and remanded due to cumulative error.

{¶ 3} After reviewing the record, we conclude that Kocevar's assignments of error lack merit. The trial court correctly found that the charges should not be severed for trial because the evidence was simple and direct. In addition, the State did not unjustifiably delay in prosecuting Kocevar. Instead, any delay was the result of the victims' delay in reporting sexual assaults to the police. Furthermore, Kocevar was not deprived of any constitutional rights by being tried and sentenced as an adult. Under R.C. 2152.02(C)(3), R.C. 2152.12(J), and 2151.23(I), the juvenile court lacked jurisdiction over Kocevar because he was 22 years old when the indictment was filed. These statutes remove juvenile jurisdiction over persons who are not taken into custody or apprehended until after they attain 21 years of age. Thus, no equal protection violation can exist because Kocevar was not similarly situated to persons who were subject to the juvenile court's jurisdiction.

**{¶ 4}** Kocevar also was not subjected to cruel and unusual punishment by losing an opportunity to participate in juvenile court proceedings. Both before and after Kocevar's alleged crimes, there was no change in any relevant statutes defining children over whom a juvenile court could exercise jurisdiction. As a result, when Kocevar allegedly committed the crimes, he had notice that he could be tried in adult court rather than remaining in juvenile court. Kocevar's sentence also did not shock the conscience. Moreover, because no pertinent statutory changes occurred after the alleged crimes were committed, no laws imposed additional punishment on Kocevar for purposes of ex post facto prohibitions against increased punishment, Finally, because no error occurred, no cumulative error could exist. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

**{¶ 5}** On June 26, 2020, an indictment was filed charging Kocevar with seven counts of rape, first-degree felonies, and two counts of gross sexual imposition (by force), fourth-degree felonies. Five rape charges were alleged to have been by force or threat of force, two were alleged to have involved a substantially impaired victim, and the nine total charges involved six alleged victims. The listed dates of the offenses were various dates in 2012, 2013, 2014, and 2016, when Kocevar was a minor and was in high school. After Kocevar pled not guilty, bond was set at $100,000 C/S, which was posted, and he was placed on electronic home detention with instructions that he have no contact with victims or minors. Kocevar was represented by retained counsel and waived his speedy trial rights on August 12, 2020.

{¶ 6} On September 24, 2020, Kocevar filed a motion for a bill of particulars, which the State provided on October 6, 2020. This revealed that the alleged victims were as follows: Count One, rape by force or threat of force of K.K., on October 18, 2014; Count Two, rape by force or threat of force of R.O. between January 1, 2016 and December 31, 2016; Count Three, rape involving a substantially impaired victim, R.O., between January 1, 2016 and December 31, 2016; Count Four, rape by force or threat of force of M.M. between January 1, 2013 and December 31, 2014; Count Five, rape by force or threat of force of A.H. between January 1, 2013 and December 31, 2014; Count Six, gross sexual imposition involving A.H. between January 1, 2013 and December 31, 2014; Count Seven, rape by force or threat of force of J.T. between April 1, 2014 and April 30, 2014; Count Eight, rape involving a substantially impaired victim, M.C., between December 31, 2012 and January 1, 2013; and Count Nine, gross sexual imposition involving M.C., between December 31, 2012 and January 1, 2013.

{¶ 7} On October 27, 2020, Kocevar filed a motion asking the court to sever the counts pertaining to each complaining witness. On the same day, Kocevar also filed a motion to suppress any statements he may have made as the result of an alleged illegal arrest and interrogation and a motion to dismiss all counts of the indictment based on the State's undue delay in bringing the prosecution. After the State responded, the court held evidentiary hearings on December 21, 2020, and March 12, 2021. The parties then filed post-hearing memoranda addressing the issues.

{¶ 8} On June 17, 2021, the court denied Kocevar's suppression motion, finding that Kocevar had not been in custody when police interviewed him, that *Miranda* warnings

had not been required, and that his statements had been knowingly and voluntarily made. The court then filed a decision on June 21, 2021, partly granting and partly denying Kocevar's motion to dismiss. In this decision, the court found that preindictment delay had prejudiced Kocevar with respect to only one complainant, K.K., due to credible evidence that Kocevar's father, Chad, had been present at the time of the October 2014 incident and had denied near that time that anything had happened. Chad had died in 2016, and Kocevar would not be able to obtain his testimony for trial. Decision, Entry and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (June 21, 2021), p. 2-3.

{¶ 9} On June 28, 2021, the State filed a motion for reconsideration of the court's ruling on the motion to dismiss. In support, the State argued that the trial court had failed to consider whether the State had had a justifiable basis for the delay. After Kocevar responded, the court issued a decision on July 19, 2021, concluding that the delay had been caused by K.K.'s failure to disclose allegations of sexual assault at the time, rather than by the State's conduct. The court then overruled Kocevar's motion to sever on August 6, 2021, finding that the State's evidence was "simple and direct." Decision, Order and Entry Denying Defendant's Motion to Sever (Aug. 6, 2021), p. 5.

{¶ 10} On August 9, 2021, Kocevar filed a response to the court's reversal of its decision on the motion to dismiss and asked for another hearing. On August 24, 2021, the court set the matter for a further evidentiary hearing on September 13, 2021. During the hearing, additional testimony from four witnesses was presented, and the parties again submitted memoranda. On October 14, 2021, the court filed another decision,

affirming its prior order vacating the dismissal of Count One. Therefore, the claims of all six alleged victims were included in the trial.

**{¶ 11}** The case was initially tried to a jury on November 29 and 30 and Dec. 1-3, 2021. After deliberating, the jury found Kocevar guilty of the rape charge concerning J.T. and not guilty of the rape and gross sexual imposition charges involving M.C., the rape charge involving M.M., and the two rape charges involving R.O. The jury was unable to reach a verdict on the rape charge involving K.K. and the rape and gross sexual imposition charges involving A.H. The court, therefore, declared a mistrial with respect to the latter three charges. A new jury trial on the remaining charges was scheduled to begin on April 27, 2022.

**{¶ 12}** Before that trial, Kocevar filed another motion asking the court to sever the remaining counts. However, the court denied the motion on April 11, 2022, finding that the case was simple and direct, based on the jury's mixed verdicts. Order and Entry Denying Defendant's Motion to Sever (Apr. 11, 2022), p. 1. After the second trial, the jury found Kocevar guilty of the remaining three charges (rape as to K.K., and rape and gross sexual imposition as to A.H.). The trial court then sentenced Kocevar to a total of 11 years in prison and ordered that he be subject to registration as a Tier III sex offender. This timely appeal followed.

## II. Denial of Severance

**{¶ 13}** Kocevar's first assignment of error states that:

> The Trial Court Erred in Denying Severance of the Charges by

Finding the Evidence Was Simple and Direct, Resulting in Prejudicing [sic]

to Kocevar When Convicted Upon Retrial of the Indictment.

**{¶ 14}** Under this assignment of error, Kocevar contends the trial court was required to order separate trials of the charges because the cases were not simple and direct. He further argues that joinder impermissibly prejudiced him because the State "synced" the identities of the complaining witnesses. In particular, Kocevar focuses on the alleged prejudicial effect of the charges involving A.H. According to Kocevar, the State failed to prove the element of force, and the only reason the second jury found him guilty was due to the prejudicial effect of joining A.H.'s case with that of K.K.

**{¶ 15}** As a preliminary point, we note that Kocevar failed to renew his objection to joinder either at the end of the State's case or at the conclusion of the evidence. *See* Transcript of Proceedings (Jury Trial) ("Trial Tr. 2"), p. 321 and 354-355. " * * * [I]f a motion for prejudicial misjoinder is not renewed at the close of the state's case or at the conclusion of the evidence, a defendant forfeits his ability to raise the issue on appeal and we review the matter only for plain error." *State v. McComb*, 2017-Ohio-4010, 91 N.E.3d 255, ¶ 51 (2d Dist.), citing *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 12 (2d Dist.). (Other citations omitted.) Therefore, we review this issue for plain error only.

**{¶ 16}** "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 62. An error affecting substantial rights "must have affected the outcome of the trial." *State v. Barnes*, 94 Ohio

St.3d 21, 27, 759 N.E.2d 1240 (2002). The law is well-established that "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. No such error occurred here.

{¶ 17} Crim.R. 8(A) allows two or more offenses to "be charged in the same indictment [or] information * * * if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Allowing joinder " 'conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries.' " *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 103, quoting *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988). While joinder is favored and "is a viable trial procedure, an accused may move to sever under Crim.R. 14 upon a showing of prejudice." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

{¶ 18} "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus.

*Accord Ford* at ¶ 104.

**{¶ 19}** "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992), citing *Hamblin* at 158-159. "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id.*, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir.1964).

**{¶ 20}** Here, Kocevar included discussion of the "other acts test" in his brief but conceded it was not satisfied here. Appellant's Brief, p. 13-14. We note that Kocevar did go on to discuss this test in the context of the retrial, contending that the jury convicted him of charges involving A.H. not because A.H.'s allegations had any merit, but because the charges were combined with the rape charge involving K.K. *Id.* at p. 21. However, the trial court did not rely on the other acts test in denying either of Kocevar's motions to sever. Instead, the court relied on the second part of the test. As a result, we need not consider whether the "other acts" test would be satisfied here.

**{¶ 21}** "Under the second method, the 'joinder' test, the state is not required to meet the stricter 'other acts' admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct." *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293, citing *State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980). (Other

citations omitted.) "Thus, when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *Id.*

{¶ 22} The Supreme Court of Ohio has said that evidence is "simple and direct," where (1) proof of each offense is "separate and distinct" or could be "readily separated"; (2) the jury is unlikely to be confused; and (3) "the evidence of each crime is uncomplicated." *State v. Coley*, 93 Ohio St.3d 253, 260, 754 N.E.2d 1129 (2001); *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 52; and *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 52.

{¶ 23} An additional point to consider is the trial court's cautionary jury instructions. *E.g., Clinton* at ¶ 52. Furthermore, the simple and direct test "focuses on whether the trier of fact is likely to consider 'evidence of one [offense] as corroborative of the other * * *.' " *State v. Wiles*, 59 Ohio St.3d 71, 77, 571 N.E.2d 97 (1991), quoting *Dunaway v. United States*, 205 F.2d 23, 27 (D.C. Cir.1953). Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, * * * but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense." (Citations omitted.) *Torres*, 66 Ohio St.2d at 343-344, 421 N.E.2d 1288.

{¶ 24} "For an appellate court to reverse a trial court ruling denying severance, the defendant must demonstrate that the trial court abused its discretion." *Id. Accord State v. Barksdale*, 2d Dist. Montgomery No. 21848, 2008-Ohio-182, ¶ 22. An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citations omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217,

219, 450 N.E.2d 1140 (1983). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.* However, "courts lack the discretion to make errors of law." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 39.

{¶ 25} In denying Kocevar's motion to sever, the trial court found before the first trial that the evidence was simple and direct. This was based on the court's consideration of the bill of particulars and the evidence presented at the hearing on the motion to sever. Decision, Order, and Entry Denying Defendant's Motion to Sever (Aug. 6, 2021), p. 5. The defense renewed the motion to sever on the record at the first trial, and the court again denied it. Transcript of Proceedings (Jury Trial) ("Trial Tr. 1"), p. 14-15.

{¶ 26} As indicated, the first trial resulted in conviction on one rape count (J.T.), not guilty findings on five counts, and a hung jury with respect to two rape counts (A.H. and K.K.) and one count of gross sexual imposition (A.H.). Consequently, the second jury trial involved only two victims and three sexual assault charges.

{¶ 27} Before the second trial, Kocevar again filed a motion seeking to sever the trial of the offenses related to the two remaining victims. The trial court denied this motion for the same reasons it had previously expressed. *See* Decision, Order, and Entry Denying Defendant's Motion to Sever (Apr. 11, 2022), p. 1. The court added that,

given the reduction of witnesses and counts for the second trial, "the evidence will be even easier for the jury to follow." *Id.*

{¶ 28} Having reviewed the record, we agree with the trial court and find no error, let alone plain error. The first trial involved six victims and nine alleged sexual offenses, but the evidence concerning each alleged victim was not complicated, nor was it difficult to understand. The jury was able to separate the evidence and acquit Kocevar of the rapes of three victims and to find him guilty of only the rape of one victim. During the second trial, the jury found Kocevar guilty of the three remaining charges involving K.K. and A.H.

{¶ 29} The alleged crimes occurred when Kocevar was in high school (primarily when he was a sophomore at Alter High School during 2013 to 2014), and no crimes were reported to the police at the time. As a result, no sexual assault evidence was obtained, and the jury did not have to sort through testimony about these matters.

{¶ 30} Five victims alleged sexual offenses that occurred on only one occasion; the other victim's (R.O.'s) complaint involved offenses that took place on two separate occasions. All the offenses also occurred primarily in one location – the apartment or house where Kocevar lived at the time -- and there were not many witnesses other than the victims.

{¶ 31} No victim reported a sexual offense until June 2020. Reporting only occurred after a June 4, 2020 "tweet" appeared on Twitter. The author of the tweet stated that, "I know a rapist who is now a cop. He went to my high school actually. System is so f*cked." Trial Tr. 1 at p. 62-63 and State's Ex. 1A. At the time of the tweet,

Kocevar was employed as a police officer in Waynesville, Ohio. A subsequent tweet identified Kocevar by name, and victims began reporting sexual offenses to the Centerville Police Department ("CPD"), which then investigated. *Id.* at 64, 232, 281, 283, 317-318, 374-375, and 499, and State's Ex. 1B. Ultimately, Kocevar was charged with nine offenses involving six victims.

{¶ 32} In challenging the court's decision on the motion to sever, Kocevar argues that the State made multiple remarks during closing argument of the second trial that "looped together and synced the identities of the complaining witnesses," and that joinder prejudicially allowed the jury to consider "other acts" evidence and to convict on the charges involving A.H. Appellant's Brief at p. 24. According to Kocevar, this was particularly troubling because the evidence of force in A.H.'s case was " 'at best thin,' " and the State never demonstrated that A.H. had communicated a lack of consent. *Id.* at p. 36-37. Having reviewed the evidence, we disagree.

{¶ 33} At the time of the alleged sexual assault, A.H. was 15 years old. She and Kocevar had mutual friends even though they had attended different Catholic grade schools. A.H. first met Kocevar at a junior high dance that took place with other Catholic schools, but they did not become friends until their freshman or sophomore year of high school. Trial Tr. 2 at p. 56-57 and 59. A.H. indicated that they had attended different high schools, that she had never been romantically involved with Kocevar, that she never considered him a romantic interest, and that she did not believe he ever had a romantic interest in her. *Id.* at p. 57.

{¶ 34} A.H. lived north of downtown Dayton, about 25 minutes away from where

Kocevar lived. In the summer of 2014, A.H., Kocevar, and a mutual friend, Sean Pauley, arranged to hang out together, and A.H.'s mother drove her to Kocevar's apartment. It was around 8:00 p.m. *Id.* at p. 57-59 and 71. A.H. had known Pauley since seventh or eighth grade, and they had had a middle-school relationship for a few months, during which they had kissed a few times. However, they were just friends in 2014. *Id.* at p. 60-61 and 335. Pauley and Kocevar went to school together at Alter during their freshman year of high school and were best friends. *Id.* at p. 334-335.

{¶ 35} When A.H. got to the apartment, Kocevar's father, Chad, was there, watching TV in the living room. Chad was in a wheelchair. *Id.* at p. 61-62. A.H. spoke briefly to Chad and then she and Kocevar went out to a fenced-in patio area, where they and Pauley sat for about an hour. A.H. then asked Kocevar if she could use the restroom and asked him show her where it was. *Id.* at p. 63. When A.H. got out of the restroom, Kocevar was still waiting outside. He then grabbed her hand and pulled her into his bedroom, which was directly next to the bathroom. *Id.* at p. 62-63.

{¶ 36} When A.H. left the bathroom, she could see Chad watching TV, but she could not see him from the bedroom. *Id.* at p. 63. Kocevar sat down on the bed while still holding A.H.'s hand and pulled her to sit down on the bed. A.H. did not know what was happening and did not want to be in Kocevar's room. *Id.* at p. 64. She had never been in there before and did not want or expect that to happen. *Id.* at p. 65. Kocevar kissed A.H. and she stated that she did not return his kiss. A.H. did testify at the first trial that she had kissed Kocevar back " '[m]aybe once.' " *Id.* at p. 79 and 83.

{¶ 37} After Kocevar kissed her, A.H. pulled away and said, "I don't think this is a

good idea. We should go back outside." *Id.* at p. 84. Kocevar then said, "No, it's okay. Just don't be too loud so my dad doesn't hear you." *Id.* Kocevar's hand was still holding A.H., and Kocevar then unbuttoned the button on A.H.'s pants, unzipped her pants, and put his hand into her pants under her underwear. Kocevar then put his fingers into A.H.'s vagina. A.H. did not want that to happen. *Id.* at p. 66.

{¶ 38} Kocevar took his hand out of A.H.'s pants, grabbed her other hand that he was not holding, and slipped A.H.'s hand into the waistband of his pants and into his pants. *Id.* at p. 68. Kocevar's penis was erect, and A.H. was not able to remove her hand. Kocevar had A.H.'s hand on his penis and "was moving it up and down over his penis." *Id.* at p. 68-69. This ultimately stopped. A.H. testified that:

> I remember at that point I don't believe that I was saying anything anymore. I just felt defeated. I had – I mean I had said things slightly, it feels like five to ten phrases of I don't want to do this or we should go back outside or we should stop.
>
> And so by that point, I had just stopped speaking because it wasn't – didn't feel like it as [sic] making a difference anyways. And then he had stopped moving my hand onto his penis and he had gotten up and he said, okay, let's go back outside.

Trial Tr. 2 at p. 69.

{¶ 39} A.H. further testified that Kocevar was bigger and stronger than she was. *Id.* at p. 78. After stopping, Kocevar left his bedroom and went back outside. A.H. then got up, zipped and buttoned her pants, and went outside, as her phone was outside on

the patio.   As soon as she got back to the patio, A.H. texted her mother and asked her to come and pick her up.   *Id.* at p. 70.

{¶ 40} A.H.'s mother also testified at the second trial.   She said that when A.H. texted asking to be picked up, this was kind of unusual because the visit had been unusually short.   In fact, A.H.'s mother was not quite home when she received the text. *Id.* at p. 94.   Additionally, A.H. was completely quiet on the way home, which was also unusual.   *Id.* at p. 97.   A.H. testified that she did not tell anyone and definitely did not tell her mother, because she was afraid that people would view her as a "slut," felt uncomfortable talking about it, and did not think people would believe her.   *Id.* at p. 72. Immediately after that night, A.H. blocked Kocevar on Instagram and deleted his phone number.   She never talked to Kocevar again after that evening.   *Id.*

{¶ 41} The charges involving A.H. were contained in counts five and six of the indictment, which alleged "sexual conduct" in violation of R.C. 2907.02(A)(2) (rape) and "sexual contact" in violation of R.C. 2907.05(A)(1) (gross sexual imposition, force).   R.C. 2907.02(A)(2) states that, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Similarly, R.C. 2907.05(A)(1) prohibits persons from engaging in sexual contact where "[t]he offender purposely compels the other person, or one of the other persons, to submit by force or threat of force."

{¶ 42} "Force" is defined under R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." " 'Force' is satisfied by 'any effort physically exerted.' "   *State v. Johnson*, 2d Dist.

Montgomery No. 26961, 2017-Ohio-5498, ¶ 21, quoting *State v. Snyder*, 192 Ohio App.3d 55, 2011-Ohio-175, 947 N.E.2d 1281, ¶ 18 (9th Dist.). In light of the above facts, Kocevar used force against A.H. *E.g., State v. Whitt*, 8th Dist. Cuyahoga No. 82293, 2003-Ohio-5934, ¶ 22 (testimony that defendant removed victim's "dress and panties without her consent is sufficient evidence of force or the threat of force"); *State v. Patel*, 2d Dist. Greene No. 2010-CA-77, 2011-Ohio-6329, ¶ 63 ("jury reasonably could have found force based on [victim's] testimony that [defendant] held her in a locked bathroom and inserted his finger in her vagina against her will and while ignoring her plea to stop").

{¶ 43} Furthermore, contrary to Kocevar's contention, "Ohio's rape statute does not require proof of the victim's lack of consent." *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 27 (2d Dist.). Nonetheless, based on the above facts, lack of consent could have reasonably been found.

{¶ 44} We note that very recently, a federal district court granted a conditional writ of habeas corpus to Hartman based on a finding that he "was denied effective assistance of counsel when his attorney repeatedly elicited facts concerning the use of force that were not elicited by the prosecutor on direct examination." *Hartman v. Ohio Adult Parole Auth.*, S.D.Ohio No. 3:19-CV-003, 2023 WL 2746209, *25 (Mar. 31, 2023).

{¶ 45} This decision, however, has no bearing on *Hartman's* observation that Ohio's rape statute does not require proof of lack of a victim's consent. Our district and others have made this comment. *E.g., State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 67 ("[a] victim's non-consent to sexual conduct is not required to prove forcible rape; rather, evidence of consent – or lack thereof – goes to the state's

ability to prove whether the defendant purposefully forced or compelled the victim. * * * Courts have found sufficient force to support a conviction under R.C. 2907.02(A)(2) when defendants engaged in combinations of minimal physical force (e.g., pushing and pulling), removing the victim's clothing, and laying on top of the victim after the victim expressed disinterest in or discomfort with the sexual contact."); *State v. Benge*, 4th Dist. Adams No. 20CA1112, 2021-Ohio-152, ¶ 31.

**{¶ 46}** We also note that Kocevar has not challenged his convictions based on insufficiency of the evidence nor has he argued that they were against the manifest weight of the evidence. Instead, he has simply said that the evidence about force with respect to A.H. was "thin" and was improperly buttressed by joinder of those charges with the rape charge involving K.K. Again, we disagree.

**{¶ 47}** In arguing that joinder should not have been allowed, Kocevar relies heavily on *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143 (7th Dist.), where the court of appeals reversed the convictions of a defendant who had allegedly sexually abused two minor children. The majority opinion in *Kaufman* noted that because the offenses had taken place at different times and involved different locations and different victims, the case, at first blush, could be considered appropriate for joinder. *Id.* at ¶ 184. However, the majority stressed that "complexity of information was not the only consideration." *Id.* at ¶ 185. In this regard, the majority stated that the inquiry before it focused " 'on whether the trier of fact is likely to consider "evidence of one [offense] as corroborative of the other." ' " *Id.*, quoting *Wiles*, 59 Ohio St.3d 71, 571 N.E.2d 97. (Other citation omitted.)

**{¶ 48}** The majority further commented that "[b]ecause there is an especially high danger that the jury may cumulate the evidence of separate offenses that are jointly tried, 'both the trial court and counsel must conduct such a trial with "vigilant precision in speech and action far beyond that required in the ordinary trial." ' " *Id.* at 187, quoting *State v. Garrett*, 12th Dist. Clermont No. CA2008-08-075, 2009-Ohio-5442, ¶ 49. (Other citation omitted.) The majority placed particular reliance on this point, noting that:

> Such "precision in speech and action" was not conducted here and is most clearly exemplified by the state's following remarks during closing arguments: "There are no eyewitnesses to these types of crimes. They happen in private with the defendant or any other defendant, and the victim. But what you have here is even stronger than if there were eyewitnesses, because you have two independent victims, separate and apart. * * * That is stronger than an eyewitness. That is *independent corroboration*. They both said what happened to them, and *they corroborate each other's stories*, because what happened to one is essentially the mirror image of what happened to the other." (Emphasis added). This statement elucidates the risk of prejudice from erroneously considering the separate evidence of JB and KC cumulatively, especially in light of the weakness of the evidence regarding victim JB.

*Id.* at ¶ 188.

**{¶ 49}** The dissenting judge concluded that reversal should not be granted "simply because sexual offenses against two child victims were joined at trial." *Id.* at ¶ 197

(Vukovich, P.J., dissenting). Judge Vukovich emphasized that joinder is favored and that "[t]he joinder test is 'less stringent' than the 'stricter' other-acts test." *Id.* at ¶ 198, quoting *State v. Johnson*, 88 Ohio St.3d 95, 109, 723 N.E.2d 1054 (2000). "Thus, policy reasons for the other-acts test should not seep into the application of the joinder test." *Id.* Judge Vukovich further noted that "[a] claim of prejudice can be negated if the evidence of each joined offense is simple and direct." *Id.* at 199, citing *LaMar*, 95 Ohio St.3d 181, 767 N.E.2d 166, at ¶ 50 and 52.

{¶ 50} As indicated, the evidence here concerning A.H. was not weak. Furthermore, our review of the State's closing argument reveals no attempt to claim that the testimony of one alleged victim independently corroborated that of the other. *See* Trial Tr. 2 at p. 356-362 and 381-396. Instead, the State focused on the evidence as it pertained to each victim. Of course, there were similarities, like the fact that both A.H. and K.K. did not report the alleged sexual assaults to the police until years later. However, that had nothing to do with an improper assertion that the alleged victims independently corroborated each other's stories. Accordingly, we disagree with any claim that joinder was prejudicial. We also note that the jury in the prior trial, which involved six victims and nine sexual assault charges, was able to distinguish among victims and found Kocevar not guilty of assaulting three victims. This case, involving only two victims, was even simpler.

{¶ 51} Accordingly, the first assignment of error is overruled.


III. Delay in Prosecution

{¶ 52} Kocevar's second assignment of error states that:

The Trial Court Erred in Denying Kocevar's Motion to Dismiss by Finding that the State's Delay in Prosecution Was Justifiable, Resulting in Kocevar Suffering Prejudicial [sic], Thereby Warranting Reversal of the Convictions.

{¶ 53} Under this assignment of error, Kocevar contends that he established actual prejudice due to the State's delay in initiating prosecution on the charge involving K.K., and that the trial court incorrectly found that the State had provided justifiable reasons for the delay. In this regard, Kocevar states that K.K. and her mother told the Centerville Police Department in October 2014 about the alleged sexual assault, and that all sexual assault allegations concerning a minor warranted further action. Kocevar further contends that K.K.'s mother also informed her brother-in-law, who was a sheriff's deputy, about the sexual assault and that the incident was reported to the school principal. According to Kocevar, the officers and the principal were mandated reporters for sexual assault, their delay in disclosure further prejudiced him, and the State failed to establish justifiable reasons for failing to act until 2020, when the police investigated several complaints, including K.K.'s, against him.

{¶ 54} Before addressing Kocevar's arguments, we will outline the law that applies to preindictment delay and the review standard in such cases.

### A.    Preindictment Delay

{¶ 55} "The Sixth Amendment to the United States Constitution guarantees the

accused in a criminal prosecution 'the right to a speedy and public trial.'  But on its face, the Sixth Amendment provides no protection to those who have not yet been accused; it does not 'require the Government to discover, investigate, and accuse any person within any particular period of time.' "  *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11, quoting *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).  "Statutes of limitations provide the ultimate time limit within which the government must prosecute a defendant – a definite point 'beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.' "  *Id*., quoting *Marion* at 322.  However, "when unjustifiable preindictment delay causes actual prejudice to a defendant's right to a fair trial despite the state's initiation of prosecution within the statutorily defined limitations period, the Due Process Clause affords the defendant additional protection."  *Id.*  This right arises under the Fifth Amendment to United States Constitution and Article I, Section 16, of the Ohio Constitution.  *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 97.

{¶ 56} The due process standard that Ohio applies in this situation involves actual prejudice and unjustifiable delay.  *Jones* at ¶ 12.  The Supreme Court of Ohio has "firmly established a burden-shifting framework for analyzing a due-process claim based on preindictment delay.  Once a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay."  *Id.* at ¶ 13, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). (Other citation omitted.)

{¶ 57} Determining " 'actual prejudice' involves 'a delicate judgment based on the

circumstances of each case.' " *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *Marion* at 325. "In making this assessment, courts are to consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Id.*, citing *State v. Luck*, 15 Ohio St.3d 150, 154, 472 N.E.2d 1097 (1984), citing *Marion* at 326. " 'Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *State v. Bourn*, Ohio Slip Opinion No. 2022-Ohio-4321, __ N.E.3d __, ¶ 17, quoting *Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 28. "The use of the word 'would' in the *Jones* decision is significant. It is not enough for a defendant to show that the missing evidence or unavailable testimony 'could' or 'may' help the defendant. Instead, the defendant must show that the evidence or testimony would help the defendant." *Id.*

{¶ 58} "The death of a potential witness during the preindictment period can constitute prejudice, but only if the defendant can identify exculpatory evidence that was lost and show that the exculpatory evidence could not be obtained by other means." *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 103.

{¶ 59} Concerning the justification for delay, "a delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant, * * * or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it

at the time that its active investigation was ceased." *Luck*, 15 Ohio St.3d at 158, 472 N.E.2d 1097. "The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable." *Id.*

{¶ 60} "Ohio appellate courts have held that decisions on motions to dismiss for pre-indictment delay should be reviewed on the following basis: legal issues are reviewed de novo, but 'the court's findings of fact are afforded great deference.' " *State v. Hawkins*, 2d Dist. Montgomery No. 27019, 2018-Ohio-867, ¶ 37, quoting *State v. Powell*, 2016-Ohio-1220, 61 N.E.3d 789, ¶ 11 (8th Dist.).

{¶ 61} With these principles and standards in mind, we will consider Kocevar's arguments.

### B.   Decision on the Motion to Dismiss

{¶ 62} As noted, the trial court initially granted the motion to dismiss the charge involving K.K. based on actual prejudice to Kocevar. The court's decision was based on the death of Kocevar's father, Chad, who was in the apartment when Kocevar allegedly raped K.K. The court then reconsidered its decision and found that while actual prejudice occurred, the State had proved that the delay in bringing charges was justifiable. The court heard evidence about this issue during two separate sets of hearings.

{¶ 63} On December 21, 2020, the court heard testimony from the following witnesses: (1) Kathryn Gerspacher, a detective with CPD; and (2) Regina Kocevar, the defendant's mother. On March 12, 2021, the court heard testimony from Nadia Dexter, another CPD police officer. Then, on September 13, 2021, the court heard testimony

from the following witnesses: (1) Jeffrey Kaercher, a CPD officer for 13 years; (2) R.K., the mother of K.K.; (3) Faupo Lauofo, a CPD officer for 24 years; and (4) Kathryn Gerspacher.

**{¶ 64}** As indicated, the trial court found that Kocevar had been prejudiced because he was unable to present evidence from his father, Chad, who had been present in the apartment at the time of K.K.'s alleged rape.   Chad died in 2016, several years before the indictment was filed.    In replying to Kocevar's assignment of error, the State has not challenged this finding.   Instead, the State has focused on the issue of justifiable delay in bringing the indictment.   We will do the same, beginning with the events pertaining to the 2014 police investigation.   This is the information that was before the court when it made rulings on the motions to sever.

1.   2014 Investigation

**{¶ 65}** Concerning K.K., the allegation was that she had been at Kocevar's apartment (where he and his father, Chad, lived) on October 18, 2014.   At that time, K.K. was in Kocevar's bedroom and he tried to kiss her.   However, K.K. "pushed him off, told him no, and [told him] that she had a boyfriend."   Transcript of Proceedings (Motion to Suppress/Motion to Dismiss/Motion to Sever (Dec. 21, 2020) ("Motion Tr. 1"), p. 19. However, Kocevar "kept insisting until he was on top of her.   When he got on top of her, he pulled her leggings down and then inserted his penis into her vagina after she repeatedly told him no."   *Id.*   After Kocevar finished, he took a picture of K.K.'s breasts, and K.K. then left the apartment.   *Id.*

**{¶ 66}** K.K. immediately told her family about the rape and also discussed the incident with a friend, M.M. *Id.* at p. 53. The night of the incident, K.K.'s mother, R.K., brought K.K. to CPD to file a police report. At the time, Officer Kaercher was on duty and took the report. Transcript of Proceedings (Motion to Dismiss) (Sept. 13, 2021) ("Motion Tr. 2"), p. 8-9.

**{¶ 67}** According to Kaercher, R.K. reported that she had picked up K.K. at Bill's Donuts after K.K. had called to complain that she had been at Kocevar's apartment and that he had given her alcohol. In order to obtain a warrant, Kaercher would have had to talk to K.K. and get direct information from her. During their discussion, Kaercher told R.K. that K.K. could potentially be charged with underage consumption if she had been drinking. *Id.* at p. 9. After hearing this, R.K. said that she did not want Kaercher to talk directly to K.K. or to check any further. Kaercher did tell R.K. that he would go to Kocevar's apartment and see if underage drinking, in fact, had occurred. *Id.* at p. 10.

**{¶ 68}** About 20 minutes later, Kaercher and CPD Officer Lauofo went to Kocevar's apartment and tried to make contact. However, most of the lights were off and no one appeared to be either awake or at home. Subsequently, around 5:30 a.m., Chad Kocevar called Kaercher and said that a neighbor had said the police had knocked at the door. When Kaercher explained that they had a complaint about underage drinking, Chad stated that he was not aware of any underage drinking. He also said that his son had gone to a football game with friends, had come home, and had watched a college football game with friends. Chad further said that he had gone to bed around 10:30 or 11:00 p.m. *Id.* at p. 10-11.

{¶ 69} According to Officer Lauofo, his understanding was that he was accompanying Kaercher to the apartment to investigate an underage drinking party. During the investigation, Kaercher never mentioned anything to Lauofo about a sexual assault. *Id.* at p. 41-42.

{¶ 70} According to Officer Kaercher, K.K.'s mother did not talk to him about a sexual assault. He said that if someone alleged a sexual assault, it would be documented in his report. However, no such allegation was in his report in this case. Motion Tr. 2 at p. 13 and Motion Tr. 1 at p. 119. Kaercher further said that even if people say they want to tell the police something off the record, an information report can be made if someone just wants something to be documented. Motion Tr. 2 at p. 13. The police have cases where criminal complaints are reported but the victims do not want to proceed with anything. *Id.*

{¶ 71} In addition, Officer Kaercher stated that he is a mandated reporter and that nothing in his October 2014 conversation with R.K. gave him any sense that his mandated reporter protocols should start. *Id.* at p. 14. During this interview, Kaercher and K.K. also never exchanged any words with each other. *Id.* at p. 16.

{¶ 72} R.K. testified that her daughter, K.K., had issues with depression and had been recently hospitalized for a suicide attempt at the time of the assault. As a result, R.K. was on top of K.K.'s activities; in fact, October 18, 2014, was the first night K.K. had been allowed out of the house. *Id.* at p. 20-21. When R.K. picked up K.K. that evening, K.K. told her everything about the sexual assault and said they had some alcohol. R.K. decided to report the underage drinking but not to report the assault due to her husband's

health problems and K.K.'s recent hospitalization. *Id.* at p. 22-24.

{¶ 73} While talking with Officer Kaercher, R.K. asked a hypothetical question about what would happen if alcohol were involved and there was a sexual assault. R.K. did not say who the victim was or that it was K.K., did not tell Kaercher where this hypothetical event took place, and did not provide any details. Tr. 2 at p. 24 and 30.

{¶ 74} R.K. subsequently called her brother-in-law, who was a captain with the Montgomery County Sheriff's Department. She asked him whether, hypothetically, if someone were raped, would it be detrimental to the victim if it was a "he said/she said" situation. The brother-in-law did not know K.K. was involved, nor did R.K. give him any details about the event, she did not want to put him in a position to have to report it. During this conversation, R.K.'s brother-in-law just gave her an opinion. *Id.* at p. 25-26 and 27. As recently as a week before the September 13, 2021 hearing, the brother-in-law was still unaware that K.K. had been sexually assaulted. *Id.* at p. 37.

{¶ 75} In speaking with CPD Officer Nadia Dexter in 2020 (after the sexual assault was reported), R.K. stated that she thought she had told Officer Kaercher in October 2014 about the situation with K.K.'s mental health, and Kearcher said she could report the sexual assault whenever she was ready. Motion Tr. 2 at p. 33-34. Again, however, R.K. stressed that she spoke hypothetically with Kaercher and did not identify K.K. as the victim. *Id.* at p. 35-36. At the time of the 2014 investigation, there were reports that underage drinking was common at Kocevar's apartment. The Centerville Police had received a number of callouts to the apartment, and the police and Alter High School administrators were aware of the prevalence of the underage drinking. Motion Tr. 1 at

p. 55-56.

**{¶ 76}** Detective Gaspacher was the lead investigator when the sexual assault complaints were lodged in June 2020 with CPD. *Id.* at 7-8. Gaspacher was not involved in the October 2014 investigation. Motion Tr. 2 at p. 48-49. According to Gaspacher, K.K. and her mother had discussed the sexual assault incident in October 2014 with Lourdes Lambert, who was then the principal at Alter High School. Motion Tr. 1 at p. 22, 27-28, and 53. CPD Officer Dexter, who did many interviews in 2020, including with K.K. and R.K., said that R.K. asked Lambert not to let K.K. be in classes with Kocevar or have any contact with him. *Id.* at p. 85-86, 108-109. However. Lambert did not testify at any pretrial hearings or at any trials.

**{¶ 77}** On October 22, 2014, Kocevar's mother, Regina, received a phone call from Lambert, who asked her to find out what was happening. According to Lambert, some girls reported that a friend had said Kocevar forced himself on K.K. Lambert then asked K.K. to come into her office, but when K.K. first talked with Lambert, she said nothing had happened. Later, K.K. and her mother talked to Lambert; at this point, they said Kocevar had forced himself on K.K. in his bedroom and that his father, Chad, had been at the apartment when this took place. *Id.* at p. 66-68.

**{¶ 78}** After speaking with Lambert, Regina Kocevar called her ex-husband, Chad, who said he had been home the entire time and that the alleged incident never happened. Chad's account was that he talked to K.K. briefly when she arrived; K.K. and Kocevar then went into Kocevar's room to visit. During this visit, the door was open and Chad sat in his usual spot in his wheelchair, where he had a line of sight into the room. Chad also

said that after the two teenagers left the bedroom, K.K. stayed for dinner and had pizza. *Id.* at p. 67-68.

**{¶ 79}** After speaking with Chad, Regina called Lambert and told her what Chad had said. At that point, K.K.'s mother said she was not going to do anything about it because K.K. had issues. *Id.* at p. 69. A vice-principal was listening in during this conversation. *Id.* The school did not report the incident to the police. *Id.* at p. 109. In addition, CPD did not have a school resource officer at Alter. *Id.* at 119.

### 2. 2020 Investigation

**{¶ 80}** After that point, nothing ever came up again about sexual assault until the allegations were made against Kocevar in June 2020. CPD first became aware of the sexual assault allegations against Kocevar on June 9, 2020, when K.K. and R.O. (another alleged victim) came to CPD, made written statements, and brought in a written statement from M.M., a third alleged victim. CPD immediately began an investigation. Motion Tr. 1 at p. 115-116 and 122-123. CPD did not delay in investigating the case. While the case took a significant amount of time to investigate due to the number of victims and allegations, CPD did not delay in proceeding. In fact, the indictment was filed shortly thereafter, on June 24, 2020. *Id.* at p. 122-123.

**{¶ 81}** After reviewing the record and giving due deference to the trial court's factual findings, we find no basis for reversing the court's judgment. There is no evidence that any delay was for purposes of gaining a tactical advantage over Kocevar, nor is there evidence that the State negligently ceased active investigation (or erred in

judgment) and then later commenced action based on evidence it had available when it stopped actively investigating. *Luck*, 15 Ohio St.3d at 158, 472 N.E.2d 1097.

{¶ 82} In his brief, Kocevar relies heavily on R.C. 2151.421, which mandates that various individuals must report knowledge or suspicion of sexual abuse. Appellant's Brief at p. 33-36. According to Kocevar, CPD, R.K.'s brother-in-law, and Alter all had a duty to report suspected sexual abuse, and their failure to pursue it caused unjustifiable delay.

{¶ 83} R.C. 2151.421(A)(1)(a) states that:

No person described in division (A)(1)(b) of this section who is acting in an official or professional capacity and knows, or has reasonable cause to suspect based on facts that would cause a reasonable person in a similar position to suspect, that a child under eighteen years of age, or a person under twenty-one years of age with a developmental disability or physical impairment, has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child shall fail to immediately report that knowledge or reasonable cause to suspect to the entity or persons specified in this division.

{¶ 84} The individuals described in R.C. 2151.421(A)(1)(b) include school personnel and peace officers (defined under R.C. 2151.421(O)(4) to include various law enforcement officers, including municipal officers). For violations of the duty to report, the statute provides for "compensatory and exemplary damages to the child who would

have been the subject of the report that was not made." R.C. 2151.421(M). Persons who participate in making such reports are given general civil and criminal immunity, with some exceptions. R.C. 2151.421(H).

{¶ 85} In his brief, Kocevar fails to cite any authority on the applicability of R.C. 2151.412 other than some general case law indicating that peace officers are subject to the mandatory reporting requirements. *See* Appellant's Brief at p. 35. That point is not in dispute here.

{¶ 86} There is no authority discussing failure to report child abuse in the specific context of whether it requires a finding of unjustifiable preindictment delay. The only two Ohio cases involving the terms "preindictment" and "R.C. 2151.421" discuss the statute in the context of whether a duty to report abuse might affect the tolling of a statute of limitations. *See State v. Jensen*, 6th Dist. Lucas No. L-20-1042, 2021-Ohio-3505, ¶ 14 (statute of limitations did not begin to run due to mother's knowledge of sexual abuse and failure to report it; parents of victims were "specifically exempted by the state legislature from the reporting requirements under R.C. 2901.13(J)(2)"); *State v. Warren*, 168 Ohio App.3d 288, 2006-Ohio-4104, 859 N.E.2d 998, ¶ 14 (8th Dist.), citing *State v. Hensley*, 59 Ohio St.3d 136, 571 N.E.2d 711 (1991) ("When the victim of a sex offense is a child, the corpus delicti generally is deemed to be discovered when the child reaches the age of majority. * * * However, when the child tells a 'responsible person' who is required by law to report the events to a peace officer or children's services agency pursuant to R.C. 2151.421(A)(1), the statute of limitations begins to run as of that time, even if the child has not attained the age of majority.").

**{¶ 87}** *Jensen* involved a 25-year delay, and the delay in *Warren* was 16 years. *Jensen* at ¶11; *Warren* at ¶ 2. In both cases, a six-year statute of limitations applied at the time of the offenses but was later increased. However, since the victims were below the age of majority when the amendment took effect, the original statute did not apply, and the criminal actions were timely brought under the increased limitations period. *Jensen* at ¶ 13-14; *Warren* at ¶ 13-14.

**{¶ 88}** The defendant in *Jensen* did raise the issue of preindictment delay, claiming that the police had intentionally delayed the indictment. This was not related to the reporting issue because there was no discussion in the case about the police having prior knowledge of the alleged sexual abuse. The court also did not dwell on preindictment delay because the defendant's guilty pleas waived this claim. *Jensen* at ¶ 15.

**{¶ 89}** In the case before us, there was no issue about whether the statute of limitations had expired. In October 2014, K.K. was 16 years old and was under the age of majority. Motion Tr. 1 at p. 90. At that point, the applicable statute of limitations was 20 years. In July 2015, the limitations period for rape was increased to 25 years. *See* Sub. H.B. 6, 2015 Ohio Laws 19, extending the rape statute of limitations in R.C. 2901.13. This was before K.K. reached the age of majority in January 2016 and the new 25-year statute applied. *See* Bill of Particulars, p. 2, and R.C. 3109.01 (which outlines the date of majority). Nonetheless, under either statute of limitations, the indictment was timely filed. That occurred in June 2020, which was a bit more than six years after the alleged crime. *See* R.C. 2901.13(F) ("[a] prosecution is commenced on the date an indictment is returned or an information filed * * *"). Thus, *Jensen* and *Warren* are irrelevant to the

issue before us.

**{¶ 90}** We do note that in *Warren*, the court remarked (not in the context of R.C. 2151.421) that "[t]he victim did not report the crime to the police until April 2004. Her delay in reporting the crime cannot be ascribed to the state for purposes of finding a violation of appellant's due process rights." *Warren*, 168 Ohio App.3d 288, 2006-Ohio-4104, 859 N.E.2d 998, at ¶ 12. That is the situation here. The police cannot be faulted for failing to investigate crimes victims choose not to report. Moreover, as noted, R.K.'s brother-in-law was not even aware that K.K. was a victim.

**{¶ 91}** It is true that "R.C. 2151.421 provides an appropriate list of responsible adults who, upon obtaining knowledge of possible child abuse, are charged by operation of law with reporting said abuse to the proper authorities." *Hensley*, 59 Ohio St.3d at 139-140, 571 N.E.2d 711. Here, the alleged sexual abuse was apparently reported to the Alter administration, but its failure to act should not be imputed to the State for purposes of preindictment delay. The United States Supreme Court has said in a related context that "mandatory child abuse reporting statutes 'alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution' for purposes of the Confrontation Clause." *State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, ¶ 21, quoting *Ohio v. Clark*, 576 U.S. 237, 192 L.Ed.2d 306, 135 S.Ct. 2173 (2015).

**{¶ 92}** In *Jackson*, the court went on to hold that "a social worker's statutory duty to cooperate and share information with law enforcement with respect to a child abuse

investigation does not render the social worker an agent of law enforcement for purposes of the Fifth and Sixth Amendments to the United States Constitution when the social worker interviews an alleged perpetrator unless other evidence demonstrates that the social worker acted at the direction or under the control of law enforcement." *Id.* at ¶ 22. The court found no evidence in *Jackson* that the social worker was acting as a law enforcement agent. *Id.* at ¶ 23-24.

{¶ 93} For purposes of its analysis, the court stressed that " '[w]hether someone is acting as an agent of law enforcement is dependent upon the unique circumstances of each case.' " *Id.* at ¶ 17, quoting *State v. Bernard*, 31 So.3d 1025, 1033 (La.2010). As in *Jackson*, no evidence was presented that Alter was acting as CPD's agent or as an agent of the State. Accordingly, even if R.C. 2151.421 applied, there would be no basis for holding that any delay in initiating prosecution against Kocevar was unjustified.

{¶ 94} Based on the preceding discussion, the second assignment of error has no merit and is overruled.

IV. Imposing Sentence on Kocevar as an Adult

{¶ 95} Kocevar's third assignment of error states as follows:

The Trial Court Errored in Sentencing Kocevar as an Adult[:] Giving Him a Mandatory Term of Incarceration[ ] Violated His Right to Equal Protection, and the Principals [sic] Against Imposition of Cruel and Unusual Punishment.

{¶ 96} Under this assignment of error, Kocevar contends that being sentenced as

an adult for crimes he committed as a juvenile violated his right to equal protection and constituted cruel and unusual punishment.  The crux of this argument is that if the offenses in question had been prosecuted when Kocevar was a minor, he would have been subject only to discretionary bindover and not the mandatory minimum punishment for rape under R.C. 2907.02.  In addition, Kocevar contends that R.C. 2152.02(C)(3) is unconstitutional as applied here because it violates the prohibition against ex post facto laws.

{¶ 97} In response, the State argues that Kocevar forfeited any error other than plain error by failing to raise constitutional challenges in the trial court.  The State further asserts that none of Kocevar's constitutional rights were violated when he was sentenced as an adult for crimes he committed as a child.

{¶ 98} Concerning the State's waiver argument, we find that Kocevar adequately raised the constitutional issues in a motion for a hearing on juvenile sanctions that he filed on April 6, 2022 (after his first rape conviction and prior to the second trial) and in his supplemental sentencing memorandum, which was filed on May 13, 2022.  The State also had a chance to respond to Kocevar's arguments and did file a response in the trial court on May 16, 2022.  Thus, we can consider the constitutional issues without resorting to plain error.  Before we do so, however, we will outline the pertinent constitutional standards.

A.  Constitutional Standards

1.  Equal Protection

{¶ 99} "The Fourteenth Amendment to the United States Constitution provides that '[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws.' The Equal Protection Clause prevents states from treating people differently under its laws on an arbitrary basis." *State v. Williams*, 88 Ohio St.3d 513, 529-530, 728 N.E.2d 342 (2000), quoting *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 681, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (Harlan, J., dissenting). " 'Whether any such differing treatment is to be deemed arbitrary depends on whether or not it reflects an appropriate differentiating classification among those affected; the clause has never been thought to require equal treatment of all persons despite differing circumstances.' " *Id.* at 530.

{¶ 100} "Under the Equal Protection Clause, a legislative distinction need only be created in such a manner as to bear a rational relationship to a legitimate state interest." *Id.,* citing *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). "These distinctions are invalidated only where 'they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them.' " *Id.*, quoting *Clements* at 963. "This rational basis analysis is discarded for a higher level of scrutiny only where the challenged statute involves a suspect class or a fundamental constitutional right." *Id.*

{¶ 101} Kocevar has not supplied authority indicating juveniles are a suspect class. In fact, he indicates they are not treated as such. Appellant's Brief at p. 44, quoting *In re Cundiff*, 10th Dist. Franklin No. 99AP-364, 2000 WL 28845 (Jan. 13, 2020). However, Kocevar does contend (without citing authority) that he should be treated as part of a

suspect class because he is a former juvenile who was later subjected to common pleas court jurisdiction. *Id.* We disagree, having found no legal authority to support such a claim. In reality, many juveniles are subjected to trial as adults. Therefore, heightened scrutiny would not apply.

## 2. Cruel and Unusual Punishment

**{¶ 102}** "The Eighth Amendment to the United States Constitution states: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' A key component of the Constitution's prohibition against cruel and unusual punishment is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, 76 N.E.3d 1127, ¶ 31, quoting *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). " 'To constitute cruel and unusual punishment, "the penalty must be so greatly disproportionate to the offense as to shock the sense of justice of the community.' " *State v. Anderson*, 151 Ohio St.3d 212, 2017-Ohio-5656, 87 N.E.3d 1203, ¶ 27, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964).

**{¶ 103}** Even in *Anderson*, which involved a juvenile who was bound over and tried as an adult while still a juvenile, the court held that an aggregate 19-year sentence did not "constitute cruel and unusual punishment because there is no national consensus against mandatory sentencing for juveniles, the sentence is proportional to the crimes he committed, and it is not one of the harshest possible penalties for juvenile offenders tried

as adults." *Id.* at ¶ 45. In that case, the defendant was 16 years old and was convicted of three counts of aggravated robbery, firearm specifications attached to those felonies, and one count of kidnapping with a firearm specification. He was originally sentenced to 28 years in prison (including consecutive sentences). After the sentence was reversed, the trial court resentenced the defendant to a total of 19 years in prison, with the 11-year terms on each robbery conviction to run concurrently with each other and consecutive to the eight-year prison term for the kidnapping and its firearm specification. *Id.* at ¶ 12-15.

### 3. Ex Post Facto Laws

{¶ 104} "Article I, Section 10 of the United States Constitution reads, 'No State shall * * * pass any * * * ex post facto Law.' The clause prohibits, among other things, '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.' " *State v. Townsend*, 163 Ohio St.3d 36, 2020-Ohio-5586, 167 N.E.3d 954, ¶ 5, quoting *Calder v. Bull*, 3 U.S. 386, 390, 1 L.Ed. 648 (1798). "In essence, 'the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.' " *Id.*, quoting *Weaver v. Graham*, 450 U.S. 24, 28-29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

{¶ 105} The "touchstone inquiry" of this particular aspect of ex post facto law "is whether a given change in law presents a ' "sufficient risk of increasing the measure of punishment attached to the covered crimes." ' " *Peugh v. United States*, 569 U.S. 530, 539, 133 S.Ct. 2072, 186 L.Ed.2d 84 (2013), quoting *Garner v. Jones*, 529 U.S. 244, 250, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000). " 'Critical to relief under the Ex Post Facto

Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.' " *Townsend* at ¶ 16, quoting *Weaver* at 30.

{¶ 106} Kocevar has raised an "as applied" challenge to R.C. 2152.02(C)(3) in the ex post facto context. "A party may challenge a statute as unconstitutional on its face or as applied to a particular set of facts." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37, citing *Belden v. Union Cent. Life Ins. Co.*, 143 Ohio St. 329, 55 N.E.2d 629 (1944), paragraph four of the syllabus. "A facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid." *Id.*, citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

{¶ 107} "Further, where statutes are challenged on the ground that they are unconstitutional as applied to a particular set of facts, the party making the challenge bears the burden of presenting clear and convincing evidence of a presently existing set of facts that make the statutes unconstitutional and void when applied to those facts." *Id.*, citing *Belden* at paragraph six of the syllabus.

{¶ 108} Bearing all the above principles in mind, we will consider Kocevar's arguments.

B.   Discussion

{¶ 109} As a preliminary point, we note that R.C. 2152.02 has been amended since

Kocevar's offenses were committed, but the definition of "child" has not been substantively changed in any way. Under R.C. 2152.02(C)(1), a "child" is defined as "a person who is under eighteen years of age," with certain exceptions that are listed in subdivision (C). As relevant here, subdivision (C) states that:

> (2) *Subject to division (C)(3) of this section*, any person who violates a federal or state law or a municipal ordinance prior to attaining eighteen years of age shall be deemed a "child" irrespective of that person's age at the time the complaint with respect to that violation is filed or the hearing on the complaint is held.
>
> (3) Any person who, while under eighteen years of age, commits an act that would be a felony if committed by an adult and who is not taken into custody or apprehended for that act until after the person attains twenty-one years of age *is not a child in relation to that act*.

(Emphasis added.)

{¶ 110} Similarly, R.C. 2151.23 has been amended a number of times since Kocevar's offenses occurred. However, there have been no changes in the relevant part of the statute. *Compare* current R.C. 2151.23(I) with the version that became effective on September 30, 2011, pursuant to Am.Sub.H.B. 86, 2011 Ohio Laws 29. As relevant here, R.C. 2151.23(I) provides that:

> If a person under eighteen years of age allegedly commits an act that would be a felony if committed by an adult and if the person is not taken into custody or apprehended for that act until after the person attains twenty-

one years of age, the juvenile court does not have jurisdiction to hear or determine any portion of the case charging the person with committing that act. In those circumstances, divisions (A) and (B) of section 2152.12 of the Revised Code do not apply regarding the act, and the case charging the person with committing the act shall be a criminal prosecution commenced and heard in the appropriate court having jurisdiction of the offense as if the person had been eighteen years of age or older when the person committed the act. All proceedings pertaining to the act shall be within the jurisdiction of the court having jurisdiction of the offense, and that court has all the authority and duties in the case that it has in other criminal cases in that court.

{¶ 111} R.C. 2152.12(J), which deals with procedures for transfers of juvenile cases, contains the same language as R.C. 2151.23(I). Again, while R.C. 2152.12 was also amended a number of times after Kocevar's alleged crimes, the current version is unchanged from the one in place at the time of the crimes. *Compare* current R.C. 2152.12(J) with the version in effect on September 11, 2011, pursuant to Am.Sub.H.B. 86, 2011 Ohio Laws 29.

{¶ 112} The Supreme Court of Ohio has held that "R.C. 2151.23(I) effectively removes 'anyone over 21 years of age from juvenile-court jurisdiction, regardless of the date on which the person allegedly committed the offense.' " *State v. Hudson*, 169 Ohio St.3d 216, 2022-Ohio-1435, 203 N.E.3d 658, ¶ 27, quoting *Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, at ¶ 14. "The three requirements that must be present

to divest the juvenile court of jurisdiction are: '(1) the defendant must have been under eighteen years of age at the time of the offense; (2) the alleged offense would be a felony if committed by an adult; and (3) the defendant must *not* have been "taken into custody or apprehended" for the offense prior to turning twenty-one years of age.' " (Emphasis sic.) *Id.*, quoting *In re H.C.*, 8th Dist. Cuyahoga No. 102601, 2015-Ohio-3676, ¶ 10.

**{¶ 113}** All the listed factors are present here, and the juvenile court could not have possibly exercised jurisdiction over Kocevar when the indictment was filed in June 2020, since Kocevar was 22 years old at that time. Instead, Kocevar was subject to prosecution in adult court, with the attendant penalties, including the mandatory minimum prison requirements that can be imposed on adult person.

**{¶ 114}** Understandably, Kocevar contends that this is inappropriate and that he should receive lesser penalties because he was a juvenile when he committed the offenses. However, that is not the law. Moreover, while Kocevar argues that transfer to adult court was discretionary in his situation, discretion means just that. If complaints had been filed in juvenile court when Kocevar was a minor, the court may have elected to transfer him to adult court. Kocevar would, therefore, be in the same situation he is now, with adult penalties.

**{¶ 115}** This point was made in *Walls*, which rejected a defendant's claim that 1997 changes to R.C. Chap. 2151 were substantive and impaired his vested rights to juvenile court proceedings. The claim was based on "the 'extraordinary' difference between delinquency proceedings in juvenile court and criminal proceedings in common pleas court." *Walls,* 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 16. Notably, the

court remarked that:

> Although the 1997 amendments to the juvenile statutes allowed criminal prosecution without the bindover proceeding required under the 1985 law, we cannot characterize this change as anything other than remedial. Even under the law in effect in 1985, Walls was subject to criminal prosecution in the general division of a court of common pleas if the juvenile court made certain determinations specified by statute. *See* former R.C. 2151.26(A) and (E), 140 Ohio Laws, Part I, 585-586. Thus, under either the 1985 law or the 1997 law, *Walls was on notice that the offense he allegedly committed could subject him to criminal prosecution as an adult in the general division of the court of common pleas.*

(Emphasis added.) *Id.* at ¶ 7.

{¶ 116} Likewise, Kocevar would have had notice before his crimes were committed that he could be subject to prosecution in adult court. Furthermore, the arguments Kocevar is making have been previously rejected, no matter how those claims may be clothed, i.e., as violations of due process and equal protection or as prohibitions against cruel and unusual punishment and ex post facto laws.

{¶ 117} For example, in *State v. Warren*, 118 Ohio St.3d 200, 2008-Ohio-2011, 887 N.E.2d 1145, the Supreme Court of Ohio held that due process is not "violated when the defendant receives a mandatory term of life imprisonment for forcible rape of a victim under age 13 when the defendant was 15 years of age at the time of the offense but not prosecuted until he had passed the age of 21." *Id.* at ¶ 1. The defendant in *Warren* was

31 years old when the rape charges were filed in 2004.   *Id.* at ¶ 2 and 16.   When the offenses occurred, 1988 laws were in effect.   *Id.* at ¶ 3.

{¶ 118} The defendant's due process claim was that "R.C. 2907.02 and R.C. 2151.02(C)(3) * * * were unconstitutionally applied to appellant, who was a minor at the time of the alleged crime; thus appellant's right to due process and a fair trial was denied when he was sentenced as an adult for crimes alleged to have been committed when he was only fifteen years old."   *Id.* at ¶ 19.

{¶ 119} Notably, the content of the statutes in question (R.C. 2152.02(C)(3), R.C. 2151.23(I), and 2152.12(J), as here) contained the same wording in 2004 as in 1988 concerning when an individual is no longer considered a "child" and when juvenile courts lose jurisdiction.   *See, id.* at ¶ 17 and 29, and fn. 5.[1]   In addition, in 1988, R.C. 2907.02(B) mandated life sentences for the rapes, and the trial court had no discretion to impose lesser sentences.   *Id.* at ¶ 14.

{¶ 120} In *Warren*, the court acknowledged that " '[a] juvenile typically lacks sufficient maturity and good judgment to make good decisions consistently and [to] sufficiently foresee the consequences of his actions.' "   *Warren*, 118 Ohio St.3d 200, 2008-Ohio-2011, 887 N.E.2d 1145, at ¶ 38, quoting *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 82.   Nonetheless, the court found that its prior decision in *Walls* "so essentially undermines Warren's position that he cannot prevail on his claim that his mandatory life sentence violates due process principles of fundamental fairness."   *Id.* at ¶ 39.   The court admitted that *Walls* was not precisely on point but found that "the

---

[1] Again, the current content of these statues remains the same, the point being that there has been no change in the wording from 1988 to 2023.

similarities between the situation in this case and in *Walls* are substantial, and the essential principles that emerge from *Walls* make it impossible for Warren to prevail on his due process argument." *Id.* at ¶ 48.

{¶ 121} Like *Walls*, the court stressed in *Warren* that the defendant was put on notice that he could be prosecuted as an adult. *Id.* And, relevant to the case before us, the court stated that:

Warren does not explicitly argue that he was prejudiced by the absence of a bindover hearing or that the juvenile court should have retained jurisdiction over his case. Instead, he claims to have been prejudiced by the trial court's inability to consider his age at the time of the offenses in sentencing him for rape. Warren argues that he would have received more favorable treatment if he had been charged with rape while still a juvenile and that that favorable treatment should extend to the rape conviction in this case. Those arguments are significantly undercut by *Walls*, in which this court held that no substantive rights are affected in this situation.

*Id.* at ¶ 51, citing *Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, at ¶ 19.

{¶ 122} In addition, *Warren* rejected the defendant's equal protection argument, which was that his sentence was unfair by being disproportionate to "similarly situated" individuals who were charged while they were still juveniles and were not bound over to adult court. *Id.* at ¶ 57. Again finding *Walls* dispositive, the court said that " 'Warren's vested rights were not impaired because under the juvenile statutes in effect when he

committed his offenses, he was always subject to criminal prosecution as an adult. * * * Warren is not 'similarly situated' to a juvenile who is charged with rape and not bound over for a trial; therefore, his sentence need not be proportionate to a sentence received by such an offender."  *Id.*, citing *Walls* at ¶ 17.

{¶ 123} Three justices concurred in the judgment only, because they were troubled by the fact that "[t]he current version of R.C. 2907.02(B), which became effective January 1, 2008, does take youth into consideration for some rape offenses * * *."  *Id.* at ¶ 65 (Lanzinger, J., concurring in judgment only).   However, the justices concluded they were bound to affirm the lower court, since former R.C. 2907.02(B), which applied to the defendant, "specified a mandatory life sentence and did not allow for the consideration of a defendant's age."  *Id.* at ¶ 64.   However, none of these points is relevant here. Consistent with *Warren*, the equal protection argument fails because Kocevar is not similarly situated to defendants who are still within juvenile court jurisdiction.

{¶ 124} Concerning cruel and unusual punishment, Kocevar mentions it but does not make a specific argument about it or cite any cases to support his position.   In certain situations, punishments for juveniles who have been tried as adults have been found to be unconstitutional as cruel and unusual punishment.   *See In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 28 (referencing *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which "prohibited the death penalty for defendants who committed their crimes before the age of 18," and *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), which prohibited "imposition of a life-without-parole sentence on a juvenile offender who did not commit homicide").

{¶ 125} "A punishment does not violate the constitutional prohibition against cruel and unusual punishments, if it be not so greatly disproportionate to the offense as to shock the sense of justice of the community."   *State v. Chaffin*, 30 Ohio St.2d 13, 282 N.E.2d 46 (1972), paragraph three of the syllabus.   Imposing a total of 11 years for three rape convictions (involving three different victims) and a gross sexual imposition conviction for one of those victims does not shock one's sense of justice.   *Compare State v. Wiesenborn*, 2019-Ohio-4487, 135 N.E.3d 812, ¶ 7, 9, 11-12 and 24-51 (2d Dist.) (rejecting an Eighth Amendment claim where defendant was sentenced to a total of 78.5 years in prison for rapes committed both while as a juvenile and when he was 19 and a senior in high school).

{¶ 126} In *Wiesenborn*, the defendant was bound over from juvenile court and was sentenced for both juvenile and adult convictions.   *Id.*   *See also State v. Strowder*, 2019-Ohio-4573, 147 N.E.3d 1253, ¶ 3 and 14 (8th Dist.) (sentence for 17-year old defendant who was bound over for various crimes including rape, was not cruel and unusual punishment because defendant "will be eligible at age 61 in relation to" these offenses and another offense in a different case); *State v. Watkins*, 2018-Ohio-5137, 126 N.E.3d 381, ¶ 4 (10th Dist.) (defendant who was bound over for various non-homicidal offenses committed at age 16 was not subjected to cruel and unusual punishment by being sentenced to 67 years in prison because defendant would be eligible for judicial release at age 50).

{¶ 127} The point here is that Kocevar's sentence could have been much worse. However, as noted, the reality also is that Kocevar's status never changed due to any

alterations in the law.

{¶ 128} We also note that in sentencing Kocevar, the trial judge expressly stated that she had considered his youth in deciding the sentence. Trial Tr. 2 at p. 438-439. The court noted that statutory grounds for imposing consecutive sentences were met and that the sentencing range could be a minimum of three years to a maximum of 34.5 years. *Id.* at p. 439. However, in light of Kocevar's youth at the time of the offenses, the judge elected not to impose consecutive sentences. *Id.* The judge imposed concurrent 11-year sentences on the three rape counts and a one-year concurrent sentence for the gross sexual imposition charge, for a total sentence of 11 years. *Id.* at p. 444-445. As a result, contrary to Kocevar's belief, the trial court did consider his youth at the time of the offenses, and he received the benefit of that consideration.

{¶ 129} As a final matter, there is no viable ex post facto claim here. As noted, the laws at the time of Kocevar's offenses never changed, and there is no possibility that his "punishment" was later increased. The only reason Kocevar was tried as an adult rather than in juvenile court is because the victims delayed in reporting crimes. This is frequently the case with sexual assault, where many victims delay reporting sexual assault for a variety of reasons, such as "fear of the offender. It could be fear that they would have to go through with the offense again several times in front of strangers. It might be fear that nothing could be done by the system that the case wouldn't be strong enough for example." *State v. Solether*, 6th Dist. Wood No. WD-07-053, 2008-Ohio-4738, ¶ 53.

{¶ 130} Based on the preceding discussion, the third assignment of error is

overruled.

## V. Cumulative Error

**{¶ 131}** Kocevar's final assignment of error states that:

As a Result of the Cumulative Errors, Appellant Requests that the Conviction Be Reversed and Remanded.

**{¶ 132}** According to Kocevar, the effect of cumulative errors (primarily about the motion to dismiss and the motion to sever) require reversal of his convictions. Allegedly compounding these alleged errors is the prejudice caused by Kocevar's inability to be tried in juvenile court, where imprisonment would not be mandatory.

**{¶ 133}** The Supreme Court of Ohio has stressed many times that under the cumulative error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). This doctrine does not apply here, because there was no error. The fourth assignment of error therefore is overruled.

## VI. Conclusion

**{¶ 134}** All of Kocevar's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.